# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MULHERN GAS CO., INC.; NEW YORK STATE BUILDERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE GAS ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION; NORTHEAST HEARTH, PATIO AND BARBECUE ASSOCIATION; PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., d/b/a Master Plumbers Council of the City of New York; HOLMES MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049; PLUMBERS LOCAL UNION NO. 200; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97; and TRANSPORT WORKERS UNION LOCAL 101, AFL-CIO,<br><br>       Plaintiffs,<br><br>  v.<br><br>ROBERT J. RODRIGUEZ, in his official capacity as New York Secretary of State and member of the State Fire Prevention and Building Code Council; NEW YORK DEPARTMENT OF STATE; NEW YORK STATE FIRE PREVENTION AND BUILDING CODE COUNCIL; and JAMES CABLE, RUTHANNE VISNAUSKAS, ROBERTA REARDON, ERIC ADAMS, MICHAEL SPANO, JOSEPH M. DESTEFANO, CLAUDIA BRAYMER, JOSEPH TOOMEY, SHAWN HAMLIN, TIMOTHY DERUYSCHER, ROBERT HUGHES, WILLIAM W. TUYN, PATRICK DOLAN, and DOMINIC MARINELLI, in their official capacities as members of the State Fire Prevention and Building Code Council,<br><br>       Defendants. | Civil Action No. 1:23-CV-1267 (GTS/CFH)<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.        Plaintiffs Mulhern Gas Co., Inc.; New York State Builders Association; National Association of Home Builders; New York Propane Gas Association; National Propane Gas Association; Northeast Hearth, Patio and Barbecue Association; Plumbing Contractors Association of Long Island; Holmes Mech. LLC; Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York; International Brotherhood of Electrical Workers Local 1049; Plumbers Local Union No. 200; International Brotherhood of Electrical Workers Local Union 97; and Transport Workers Union Local 101, AFL-CIO seek declaratory and injunctive relief under federal law against enforcement of New York statutes that ban fuel gas appliances that are subject to regulation under the federal Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422.

2.        The State of New York's recent ban of gas equipment and infrastructure is preempted by EPCA and therefore unenforceable.  As the only federal appellate court to have addressed this issue recognized, EPCA preempts state and local laws relating to the use of energy, such as gas, by covered appliances and equipment.  The State's gas ban therefore violates federal law.  EPCA reflects Congress's decision that the nation's energy policy cannot be dictated by state and local governments; such a patchwork approach would be the antithesis of a national energy policy.  Further, millions of New Yorkers use natural gas, propane, and oil for home heating, cooking, and hot water, particularly in the coldest winter months, and the decision to outright prohibit the use of all fuel gas—even propane—in new buildings is at odds with citizens' and businesses' need for reliable, resilient, and affordable energy.  Prohibiting gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the public interest and consumer choice, exacerbates the State's housing affordability crisis, and shifts the State's energy demand onto its already overburdened electric grid.  Plaintiffs support

achieving the State's climate goals, but with the majority of New York's electric generating capacity coming from gas-fired power plants, banning gas in homes will do little if anything to advance those goals—and in all events, the State must comply with federal law.

3.      Plaintiffs are companies, trade associations, and unions that rely on the availability of gas appliances and systems for their livelihoods.  Plaintiffs and their members span a broad array of industries and labor, such as construction, retailing, manufacturing, delivery, and servicing related to fuel gas and fuel gas appliances and infrastructure.  New York's ban is already chilling and undermining their livelihoods, harming business revenues and profits, disrupting long-term business strategy and asset planning, jeopardizing jobs and hiring and training programs, and hampering the development of industry labor pools.  Ultimately, it will compel them to exit some or all of their businesses and trades—all despite the ban's express preemption under federal law. The gas ban has economic implications for multiple industries that cross state lines, demonstrating the need for a cohesive national energy policy.  The ban presents an existential threat for the small, family-owned businesses in New York that sell, install, and service gas equipment and infrastructure.  And it threatens the livelihoods of the individuals who work in these fields. The ban is set to go into effect for buildings under seven stories beginning December 31, 2025, but it already is causing irreparable harm to Plaintiffs today.

4.      The federal energy policy reflected in EPCA was born out of the oil crisis of the 1970s and reflects concerns with energy independence, domestic supply, and national security. The federal regulatory scheme requires a practical approach to energy regulation, maintaining neutrality on energy sources and recognizing the need for a diverse energy supply.  This is for good reason: A patchwork approach is unworkable, undercuts a coordinated national energy policy, overlooks the public's need for reliable and resilient energy, and denies consumers choice.

5.      EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances.  The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice, and that one type of energy should not be favored over another in the areas it regulates.  EPCA thus expressly preempts state and local regulations concerning the energy efficiency and energy use of products for which EPCA sets energy conservation standards, leaving only narrow room for concurrent state and local regulations that meet certain stringent statutory conditions.  EPCA's default rule is federal preemption; Congress intended for national policy to control.  *See, e.g.*, 42 U.S.C. § 6297(c); S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

6.      Just weeks before New York enacted its ban, the Ninth Circuit invalidated the City of Berkeley's comparable prohibition on gas piping in new buildings.  *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023), *petition for reh'g en banc filed*, No. 21-16278 (9th Cir. May 31, 2023).  The unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings."  *Id.* at 1056.  New York's ban on gas appliances and infrastructure in new buildings does exactly what the Ninth Circuit concluded was preempted.  No statutory exemption to preemption applies to New York's ban.  Nor does New York's gas ban meet the statutory requirements for a waiver of preemption—and on information and belief, New York has not applied for a waiver.

7.      In short, New York's gas ban is already causing substantial adverse consequences for Plaintiffs and the public.  New York's effort to bypass federal law to implement its own energy policy violates EPCA, is contrary to the public interest, and causes irreparable harm to Plaintiffs

4

and their members.  Plaintiffs accordingly bring this action seeking a declaration that New York's gas ban is preempted by EPCA and therefore unenforceable, as well as an injunction preventing its enforcement.

## JURISDICTION

8.      This Court has federal question jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

## VENUE

9.      Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants New York Department of State and New York State Fire Prevention and Building Code Council have offices in this District, all Defendants reside in this State, and at least one of the individual Defendants performs their official duties in this District and so resides here for the purpose of § 1391.  Venue is also proper because the acts and events giving rise to the claims occurred at least in part in this District, and the regulations at issue will be enforced here.

## PARTIES

10.      Plaintiff Mulhern Gas Co., Inc. is a for-profit corporation organized under the laws of New York with its principal office in Columbia County, New York.

11.      The impending gas ban is causing current and imminent harm to Mulhern Gas's revenues and business operations.  Mulhern Gas has been a small, family-owned business in New York for over a century and has delivered, installed, and serviced propane equipment and propane gas for local customers for more than fifty years.  The impending gas ban is an existential crisis for the company—New York has outlawed much of its new business development and impacted its existing business.

12.      Mulhern Gas's propane delivery and installation sales have declined since New York passed the gas ban.  Mulhern Gas has observed that, in anticipation of the gas ban, its

customer base is increasingly turning to alternative energy sources for cooking and heating, which in turn is decreasing sales and diverting business.  Mulhern Gas is accordingly experiencing or will imminently experience diminishing returns on its long-term equipment and property investments because of the impending gas ban.

13.    The impending ban is also disrupting Mulhern Gas's business by, for example, compelling it to forgo or delay planned investments into fuel tanks, trucks, and other equipment. The ban threatens Mulhern Gas's viability as a going concern.  Even today it is struggling to hire qualified service technicians given concerns about the future of the propane service industry in light of the impending gas ban.

14.    Plaintiff New York State Builders Association ("NYSBA") is a nonprofit corporation organized under the laws of New York with its principal office in the County of Rensselaer, New York.  NYSBA represents the New York residential building construction industry and has approximately 1,800 members, including construction companies, contractors, engineers, and architects.  Its members employ tens of thousands of New York residents.  Its mission is to create a strong business environment and ensure its members' ability to provide quality housing for all New Yorkers.

15.    Plaintiff National Association of Home Builders is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C.  It represents the U.S. residential building construction industry and has approximately 120,000 members across all fifty states.  The National Association of Home Builders is affiliated with 14 local organizations in New York, and its membership in New York overlaps with NYSBA's membership.  Its mission is to protect and provide housing opportunities for the American public while promoting the business interests of its members.

16.     Both the NYSBA and the National Association of Home Builders have one or more members that do business in New York and are suffering or will imminently suffer harm to their revenues and business operations as a result of the impending gas ban.  For example, a company that is a member of both associations has already commenced a building project involving gas infrastructure that cannot be completed before the ban's effective date.  Before the gas ban was enacted, that member committed to costly working drawings and specifications that incorporate gas infrastructure.  The member has also already contracted with a gas utility to install the project's gas infrastructure, consistent with the common practice in the industry.  Prohibiting the member from delivering the promised customers to the utility will require the member to pay the cost of the infrastructure that the utility would otherwise bear.  The impending gas ban is thus forcing the member to either proceed and risk penalties or otherwise delay its project timeline at great expense while making costly modifications to existing building and infrastructure plans.

17.     Additionally, the impending gas ban is causing or will imminently cause at least one member of both associations to unnecessarily bear increased costs associated with residential construction, ownership, and maintenance arising from the prohibition of effective, available, and affordable fuel gas appliances.

18.     Members of both associations accordingly are experiencing or will imminently experience harm in the form of economic injuries, altered business practices, and compliance burdens because of the impending gas ban.

19.     Plaintiff New York Propane Gas Association is a nonprofit corporation organized under the laws of New York with its principal office in the County of Rensselaer, New York.  It represents the New York propane industry and has approximately 250 members, including propane retailers and delivery companies.  Its members employ approximately 3,000 New York residents.

Its mission is to educate people about and promote the propane industry in New York.

20.    Plaintiff National Propane Gas Association is a nonprofit corporation organized under the laws of New Jersey with its principal office in Washington, D.C.  It represents the U.S. propane industry and has approximately 2,400 members across all fifty states, including more than 100 members in New York.  Its members include propane retailers and equipment manufacturers. Its mission is to advance safety and increase the use of propane through public policy.

21.    Each of these two associations has one or more members who do business in New York and for whom the impending gas ban is causing or will imminently cause harm to profits and business operations.  Mulhern Gas is a member of both associations.  Other members are likewise harmed by the gas ban.  For example, a member of both associations is experiencing a decline in sales and losing business because of the impending gas ban.  This member is experiencing or will imminently experience diminishing returns on long-term equipment and property investments because of the impending gas ban.  The ban has already harmed the member, who must forgo investments into fuel tanks, trucks, and other equipment that would otherwise form the foundation for long-term profits.  A different member has also observed a decrease in the quality and quantity of job applicants for open positions because of the gas ban.  Another member is being forced to cease acquisition activities in New York given the uncertain future availability of gas appliances and systems. And other members have suffered diminished company values.

22.    Members of the New York and National Propane Gas Associations accordingly are experiencing or will imminently experience harm in the form of economic injuries, altered business practices, and compliance burdens because of the impending gas ban.

23.    Plaintiff Northeast Hearth, Patio and Barbecue Association is a nonprofit corporation organized under the laws of New Hampshire with its principal office in Massachusetts.

Northeast Hearth has approximately 300 members and represents distributors and retailers in New York involved in the sale, service, and installation of stoves, ovens, spa and pool heaters, and gas chimney heating systems.  Its members in New York are local, small family-owned businesses. Its mission is to promote all aspects of the hearth, patio, and barbecue industries; to educate consumers on the benefits, proper use and maintenance of all systems and products; and to communicate effectively with legislators and regulators regarding public policy.

24.     One or more members of Northeast Hearth are suffering, or are imminently facing, harm to revenues and operations from the gas ban.  For example, the impending gas ban is compelling at least one member to delay or forgo long-term investments into products that would otherwise form the foundation for its long-term profits.  Additionally, members of Northeast Hearth have either already laid off or imminently plan to lay off some of their workforce in anticipation of the gas ban's adverse business impact.  Other members are facing labor shortages that have been exacerbated by existing and potential employees' concerns about the future of the industry in light of the impending gas ban.  Multiple members have or will have to lay off anywhere from 20 to 40 percent of their workforce.

25.     Plaintiff Plumbing Contractors Association of Long Island is a nonprofit corporation organized under the laws of New York with its principal office in the County of Suffolk, New York.  The Plumbing Contractors Association represents the interests of plumbing contractors in Suffolk County and Nassau County and has approximately 80 member companies. Its members employ about 600 New Yorkers.  Its mission is to advance the plumbing industry and promote the overall welfare of Nassau and Suffolk County plumbing contractors.  Gas plumbing projects represent about 30 percent of its members' business; New York's gas ban will eliminate much of that business.

26.     One or more members of the Plumbing Contractors Association are suffering, or are imminently facing, harm to revenues and operations from the gas ban.  For example, a member has already lost business opportunities because long-term residential construction projects have begun to proceed without gas infrastructure plans in preparation for compliance with the gas ban. This member initially submitted a bid on a large, long-term residential construction project involving gas infrastructure, but the developer eliminated the portion involving gas plumbing, which represented millions of dollars in revenue.  With the gas plumbing work eliminated, the project will employ 30 to 40 percent fewer plumbers.

27.     Plaintiff Licensed Plumbing Association of New York City, Inc. d/b/a Master Plumbers Council of the City of New York is a nonprofit corporation organized under the laws of New York with its principal office in Queens County, New York.  The Master Plumbers Council is a professional trade association whose membership comprises licensed master plumbers and their affiliates in the City of New York.  It has more than 300 members, including nearly 250 licensed plumbers in New York City, along with associated businesses.  The Master Plumbers Council strives to promote the licensed plumbing industry and the benefits of hiring a licensed and insured firm, as well as providing education and clarification on a wide assortment of code issues.

28.     One or more members of the Master Plumbers Council are suffering, or are imminently facing, lost business as a result of the gas ban.  For example, building renovations planned with gas piping have been changed to use all-electric systems, leading members' contracts to be downsized or canceled; eliminating gas piping reduces the amount of plumbing work a project requires.  At least one member has also experienced an overall reduction in business hours.

29.     Plaintiff Holmes Mech. LLC ("Holmes Mechanical") is a for-profit company organized under the laws of New York with its principal office in Franklin County, New York.

Holmes Mechanical is a leading HVAC and gas systems contractor serving Franklin, St. Lawrence, and Clinton Counties.  Its focus is on engineering and installation of high efficiency boilers, furnaces, and water heating equipment, including natural gas and propane appliances as well as heat pumps.  It also specializes in liquid propane gas systems ranging from small residential applications to large industrial design and installation.  The gas ban is already severely affecting Holmes Mechanical's business, including by undermining its ability to sell propane heating equipment.  The ban has caused customers to be concerned that propane and the equipment and parts for their appliances will soon become unavailable, leading them to decline to purchase propane appliances.

30.     Plaintiff International Brotherhood of Electrical Workers Local 1049 is a labor union with its principal office in Holtsville, New York.  IBEW Local 1049 represents about 4,000 union members who are employed in the electric and gas industry on Long Island and Far Rockaway, Queens, of whom approximately 1,500 are employed in the gas industry.  The loss of work on natural gas infrastructure as a result of the ban will cost some of its members their jobs, result in lower hours worked by members, or lead to hiring freezes.

31.     Plaintiff Plumbers Local Union No. 200 is a labor union with its principal office in Ronkonkoma, New York.  Local 200 is a member of the United Association of Plumbers, Fitters, Welders, and HVAC Techs.  Local 200 represents about 1,000 plumbing workers in Nassau and Suffolk Counties whose work includes plumbing and gas fitting for industrial, commercial, and municipal construction, alteration work, residential construction, and transportation fuel facilities. The loss of work on gas infrastructure as a result of the ban will cost some of its members their jobs, result in lower hours worked by members, or lead to hiring freezes.

32.     Plaintiff International Brotherhood of Electrical Workers Local Union 97 is a labor

union with its principal office in Syracuse, New York.  Local Union 97 represents approximately 4,300 power professionals, of whom about 1,500 will be affected by the gas ban.  Local Union 97's purpose includes organizing electrical and gas utility workers to promote reasonable methods of work, secure employment, reduce hours of daily labor, secure adequate pay for work, and to seek a higher standard of living and security for members.  The loss of work on natural gas infrastructure as a result of the ban will cost some of its members their jobs, in turn causing ripple effects throughout their communities.

33.     Plaintiff Transport Workers Union Local 101, AFL-CIO is a labor union with its principal office in New York, New York.  TWU Local 101 represents approximately 1,500 employees of National Grid in Brooklyn and Queens, including physical service, maintenance, operations, and clerical employees.  Its members' work includes ensuring the safety of National Grid customers and the proper transmission and distribution of natural gas throughout the boroughs.  The loss of work on natural gas infrastructure as a result of the ban will cost some of its members their jobs, result in reduced hours, or freeze hiring and training.

34.     Aside from Mulhern Gas and Holmes Mechanical, Plaintiffs are organizations with standing to bring this action on behalf of their members because the interests they seek to address through this action are germane to their fundamental purposes; each has one or more members injured as a result of the ban and who would independently have standing; and the claims seek only declaratory and injunctive relief and so do not require individual members' participation.

35.     Defendant New York Department of State is an agency of the New York State government under the leadership of the Secretary of State of New York, who is responsible for enforcement of the provisions of New York's Energy Law mandating the gas ban.

36.     Defendant New York State Fire Prevention and Building Code Council (the "Code

Council") is an agency under the Department of State with delegated authority to amend and enforce New York State's Uniform Fire Prevention and Building Code and Energy Conservation Construction Code incorporating the gas ban.

37.     Defendant Robert J. Rodriguez is sued in his official capacity as the New York Secretary of State and as a member of the Code Council.  As Secretary of State, he is responsible for enforcement of the provisions of New York's Energy Law and Executive Law mandating the gas ban.  As a member of the Code Council, he is responsible for amending and enforcing New York State's Uniform Fire Prevention and Building Code and Energy Conservation Construction Code incorporating the gas ban.

38.     Defendants James Cable, RuthAnne Visnauskas, Roberta Reardon, Eric Adams, Michael Spano, Joseph M. DeStefano, Claudia Braymer, Joseph Toomey, Shawn Hamlin, Timothy DeRuyscher, Robert Hughes, William W. Tuyn, Patrick Dolan, and Dominic Marinelli are the other members of the Code Council and are sued in their official capacities.  As members, they are responsible for amending and enforcing New York State's Uniform Fire Prevention and Building Code and Energy Conservation Construction Code incorporating the gas ban.

39.     An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendants concerning the validity of New York's gas ban.  Plaintiffs contend that the gas ban is preempted by EPCA.  Plaintiffs are informed and believe, and on that basis allege, that Defendants disagree with Plaintiffs' contentions and assert that the gas ban is lawful and enforceable.

40.     Enforcement of the gas ban will injure Plaintiffs or their members.  Those injuries will likely be redressed by a favorable ruling from this Court.

41.     Plaintiffs challenge the facial validity of certain provisions of the New York Energy

Law and New York Executive Law.  There is no set of circumstances under which New York's gas ban would be valid under federal law.

## ALLEGATIONS

**The New York Gas Ban**

42.     On May 2, 2023, New York adopted its 2024 fiscal year budget, which included two substantively identical amendments to New York's Energy Law and to its Executive Law that mandate a prohibition on "the installation of fossil-fuel equipment and building systems" in most new buildings under seven stories.  *See* N.Y. Energy § 11-104(6)-(8); N.Y. Exec. § 378(19).

43.     Specifically, the Energy Law and Executive Law now direct the Code Council to include the prohibition in the State's Energy Conservation Construction Code (the "Energy Code") and in the Uniform Fire Prevention and Building Code (the "Building Code," and together, the "Codes").  *See* N.Y. Energy § 11-101, -104; N.Y. Exec. §§ 377-378.

44.     The Code Council is authorized to adopt and amend the Codes, but its discretion and authority over their content is constrained by statute.  *See* N.Y. Energy § 11-104; N.Y. Exec. § 378.  Here, the Energy Law and Executive Law tell the Code Council exactly what it must do, leaving it without discretion to choose anything short of the outright gas ban the statutes prescribe.

45.     The amendment to the Energy Law provides that the Energy Code "shall prohibit the installation of fossil-fuel equipment and building systems" in "any new building not more than seven stories in height, except for a new commercial or industrial building greater than [100,000] square feet in conditioned floor area" beginning December 31, 2025.  N.Y. Energy § 11-104(6)(b).  The prohibition will then expand to "all new buildings" beginning January 1, 2029.  *Id.*  New buildings are those not "existing prior to the effective date of the applicable prohibition."  *Id.* § 11-104(7)(a).

46.     The amendment to the Executive Law requires the prohibition to be included in the

Building Code but is otherwise substantively identical to the amendment to the Energy Law.  N.Y. Exec. § 378(19) (the Building Code "shall prohibit the installation of fossil-fuel equipment and building systems, in any new building not more than seven stories in height, except for a new commercial or industrial building greater than one hundred thousand square feet in conditioned floor area" beginning December 31, 2025 and "shall prohibit the installation of fossil-fuel equipment and building systems, in all new buildings" beginning January 1, 2029).

47.     New York's gas ban is unambiguous as applied to new buildings.  "Fossil-fuel equipment and building systems" is defined to mean "(i) equipment, as such term is defined in section 11-102 of [the Energy Law], that uses fossil-fuel [*sic*] for combustion; or (ii) systems . . . associated with a building that will be used for or to support the supply, distribution, or delivery of fossil-fuel [*sic*] for any purpose, other than for use by motor vehicles."   N.Y. Energy § 11-104(8)(a); N.Y. Exec. § 378(19)(g)(i).  "Equipment" is in turn defined in the Energy Law to include "[p]lumbing, heating, electrical, lighting, insulating, ventilating, air conditioning, and refrigerating equipment, elevators, escalators, and other mechanical additions or installations." N.Y. Energy § 11-102(8).  Therefore, by "prohibit[ing] the installation of fossil-fuel equipment and building systems" in most new buildings, the gas ban directly and unambiguously prohibits the installation of gas appliances and equipment as well as gas infrastructure in those buildings.

48.     The gas ban statutes provide for the Council to include limited "exemptions" in the Codes that allow the installation of fossil fuel equipment and building systems for "emergency back-up power and standby power systems"; "in a manufactured home"; and in buildings or "part[s]" of buildings used for certain enumerated purposes, such as a "medical facility," "laundromat," or "commercial food establishment."  N.Y. Energy § 11-104(7)(b); N.Y. Exec. § 378(19)(c).  Even when those exemptions apply, the Codes must "include provisions that, to the

fullest extent feasible, limit the use of fossil-fuel equipment and building systems to the system and area of the building for which a prohibition on fossil-fuel equipment and building systems is infeasible," require that "area or service" to be "electrification ready," and "minimize emissions from the fossil-fuel equipment and building systems that are allowed to be used."  N.Y. Energy § 11-104(7)(c); N.Y. Exec. § 378(19)(d).  "Financial considerations shall not be sufficient basis to determine physical or technical infeasibility."  N.Y. Energy § 11-104(7)(c); N.Y. Exec. § 378(19)(d).  Finally, there is a narrow exemption for "a new building construction project that requires an application for new or expanded electric service" if the New York Public Service Commission determines that "electric service cannot be reasonably provided by the grid as operated by the local electric corporation or municipality."  N.Y. Energy § 11-104(7)(e); N.Y. Exec. § 378(19)(f).

49.     Because the statutes provide that the Codes "**shall prohibit**" gas appliances and infrastructure by the effective dates, the Code Council has a statutory obligation to integrate the ban into the Codes.  N.Y. Energy § 11-104(6)(b) (emphasis added); N.Y. Exec. § 378(19)(a).  The Code Council does not have discretion to delay the gas ban, refuse to implement it, or alter its scope.  There are accordingly no contingencies that would interfere with the statutorily prescribed effective dates.

50.     The Code Council is required to integrate the gas ban into the Codes in conformance with the statutory requirements.  The Secretary of State is expressly charged with enforcing the gas ban.  *See* N.Y. Energy § 11-107; N.Y. Exec. § 381.

51.     On information and belief, the Code Council has begun the process of integrating the gas ban into the Codes as directed by statute.

**Federal Energy Policy and Regulation**

52.     Born out of the oil crisis the United States faced in the early 1970s, the Energy

Policy and Conservation Act of 1975, 42 U.S.C. §§ 6201-6422, establishes a "comprehensive energy policy" designed to address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005), *abrogated in other part by Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016); *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004). Among other topics, EPCA regulates the energy efficiency and energy use of covered appliances and equipment.

53.     Since the original version of EPCA in 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency, which relied on consumers to choose more efficient appliances, and toward binding federal standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and energy efficiency itself and further limited states' authority in this area.

54.     In EPCA's original form, its provisions regarding consumer appliances focused on requiring labeling of appliances, on the theory that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute "required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective." *Air Conditioning*, 410 F.3d at 499; *Nat. Res. Def. Council*, 355 F.3d at 185. The legislative history memorializes Congress's intent at the time: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H. Rep. No. 94-340, at 95

(1975).

55.     In that early form, EPCA permitted significant state involvement, allowing "state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Air Conditioning*, 410 F.3d at 499.

56.     In 1977, President Carter created the federal Department of Energy to coordinate a federal response to the nation's energy problems.  And the next year, Congress passed a range of statutes known as the National Energy Act, which gave the federal government broader authority over energy policy and sought to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth.

57.     As part of that 1978 effort, Congress amended EPCA.  Rather than relying exclusively on labeling, the new approach "required the [Department of Energy] to prescribe minimum energy efficiency standards" for certain products.  *Air Conditioning*, 410 F.3d at 499; *see also Nat. Res. Def. Council*, 355 F.3d at 186.  The amendment also strengthened EPCA's preemption, allowing state regulations "*only* if the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce." *Air Conditioning*, 410 F.3d at 499.

58.     Despite these new requirements, the Department of Energy did not adopt federal energy efficiency and use standards.  Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption.  As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

59.     Congress responded in 1987 by again amending EPCA.  Among other changes,

Congress added the preemption provision at issue here. *See* National Appliance Energy Conservation Act of 1987, Pub. L. No. 10012, § 7, 101 Stat. 103, 117-22.

60.    The purpose of the 1987 amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6 at 2. As Congress recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." *Id.* at 4; *see also* H.R. Rep. No. 100-11, at 24 (1987) ("Section 7 is designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements.").

61.    The amended statute broadly preempts state and local regulations concerning the energy use or energy efficiency of covered appliances, but then it returns ground to state and local governments so long as they comply with the statutory terms. States can still seek permission under the amended statute to establish their own standards, but "achieving the waiver is difficult." S. Rep. No. 100-6 at 2. It requires showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.* Moreover, Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." *Id.* at 10-11. To avoid preemption, a state building code provision must, among other requirements, "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11.

62.     In 1992, Congress again amended EPCA, expanding its federal appliance program to include commercial and industrial appliances.

63.     Congress has made a handful of minor amendments to EPCA's preemption provisions since 1987, none of which are relevant here.

**EPCA's Express Preemption Provisions**

64.     EPCA expressly preempts state regulations concerning the energy use or energy efficiency of covered appliances, subject to a few narrow exceptions.  The statute sets out specific requirements that must be met to qualify for those exceptions.  That structure reflects Congress's choice to preempt all state and local regulation of energy use and energy efficiency by covered appliances, replacing it with detailed conditions that must be met for state or local laws in this area to avoid preemption.

65.     EPCA regulates the energy efficiency and energy use of a variety of consumer and industrial products, which the statute calls "covered products."  Its standards for "consumer product[s]" cover a range of appliances, including water heaters, furnaces, dishwashers, and stoves.  42 U.S.C. §§ 6291(1)-(2), 6292(a).  It also contains standards for "industrial equipment," including furnaces and water heaters.  *Id.* § 6311(2)(A).  Those definitions are not tied to who is using the product.  A product qualifying as a "consumer product" but used in a commercial enterprise is still a "consumer product."  *See id.* §§ 6291(2), 6929(a), 6311(2)(A)(iii).

66.     The express preemption provision in EPCA's consumer product regulations states that "effective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions.  42 U.S.C. § 6297(c).

67.     "Energy use" is defined as "the quantity of energy directly consumed by a consumer

product at point of use." 42 U.S.C. § 6291(4).  "Energy" is defined as "electricity, or fossil fuels," such as natural gas or propane.  *Id.* § 6291(3).

68.     Putting these definitions together, EPCA preempts regulations relating to "the quantity of [fossil fuel] directly consumed by" covered consumer appliances at the place where those appliances are used.

69.     Similarly, EPCA's industrial equipment provisions expressly preempt "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute.  42 U.S.C. § 6316(b)(2)(A).  In the industrial product standards, "energy use" means "the quantity of energy directly consumed by an article of industrial equipment at the point of use."  *Id.* § 6311(4).  And "energy" is defined in the same way as for the consumer product standards.  *Id.* §§ 6311(7), 6291(3).

70.     EPCA thus preempts regulations relating to the "quantity of [fossil fuel] directly consumed by" covered industrial equipment at the place where those appliances are used.

**New York's Gas Ban Is Preempted by EPCA**

71.     New York's gas ban falls within the heart of EPCA's express preemption provisions.  The gas ban is a regulation concerning the energy use of appliances covered by EPCA in that it "prevent[s] such appliances from using" fossil fuels, such as propane or natural gas.  *Cal. Rest.*, 65 F.4th at 1048 (emphasis omitted).  The gas ban therefore is preempted by federal law.

72.     The Ninth Circuit—the only federal court of appeals to have addressed the scope of preemption under § 6297(c)—recently held in *California Restaurant Association v. City of Berkeley*, *supra*, that "[b]y its plain text and structure," § 6297(c)'s preemption provision "encompasses building codes that regulate natural gas use by covered products," including those that "prevent[] such appliances from using natural gas."  65 F.4th at 1048 (emphasis omitted).  That case involved a Berkeley, California ordinance that, rather than "directly banning those

appliances in new buildings," banned fuel gas piping in new construction, "rendering the gas appliances useless." *Id.*

73.     The unanimous Ninth Circuit panel explained that "EPCA preempts regulations that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used." *Cal. Rest.*, 65 F.4th at 1050-51 (alteration in original) (quoting 42 U.S.C. § 6291(4)).  "[A] regulation that prohibits consumers from using appliances necessarily impacts the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Id.* at 1051 (alteration in original) (quoting 42 U.S.C. § 6291(4)).  Berkeley's gas ban thus was preempted by EPCA "because it prohibits the installation of necessary natural gas infrastructure on premises where covered natural gas appliances are used." *Id.*

74.     New York's gas ban goes even further into preempted territory than Berkeley's. Rather than limiting its ban to gas piping, New York directly banned covered gas appliances. Under New York's gas ban, gas appliances cannot be installed in new buildings, and new buildings cannot have the infrastructure needed to fuel them either.

75.     The gas ban does not qualify for any of EPCA's narrow exceptions to preemption.

76.     On information and belief, New York has not applied for a waiver from the Secretary of Energy, as would be required for § 6297(d)'s exception.  Nor could it lawfully obtain such a waiver.  EPCA prohibits the Secretary from granting a waiver where, as here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver.  42 U.S.C. § 6297(d)(4).

77.     Nor does the gas ban satisfy the narrow exception for certain building code

requirements.  42 U.S.C. § 6297(f)(3).  That exception requires a regulation to meet seven specific requirements that, taken together, are intended to allow only codes that use consumption objectives and give builders choice about how to increase overall efficiency, ensuring an evenhanded policy that does not force builders to choose one type of appliance over another.  *See* S. Rep. 100-6 at 10-11 (1987).

78.     The gas ban fails several of those requirements.  It does not "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective," 42 U.S.C. § 6297(f)(3)(A).  Rather, without regard to any general target—or even whether the result of applying the ban makes a building use more or less energy—the gas ban prevents builders from selecting any appliances that use gas.  Nor does the gas ban provide credits "for installing covered products having energy efficiencies exceeding" federal standards "on a one-for-one equivalent energy use or equivalent cost basis," *id.* § 6297(f)(3)(C).  No matter how far they exceed federal standards, gas appliances get no credit at all because they cannot be installed.  And the gas ban does not "specif[y]" any "energy consumption or conservation objective," let alone do so "in terms of an estimated total consumption of energy" calculated in the manner prescribed by statute, *id.* § 6297(f)(3)(F).

79.     Similar to the consumer product provisions, EPCA contains only limited exceptions to the default rule of preemption of state regulations concerning the energy use of industrial appliances.  42 U.S.C. § 6316(2)(B).

80.     To avoid preemption for industrial appliances, a state regulation in a building code must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1."  42 U.S.C. § 6316(2)(B)(i).

81.     New York's gas ban does not qualify for that exception because it bans all gas

appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

### CAUSE OF ACTION:
### FEDERAL PREEMPTION BY THE ENERGY POLICY AND CONSERVATION ACT

82.   Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

83.   New York's gas ban is preempted by EPCA.

84.   The gas ban concerns the energy use of all gas appliances, including appliances covered by EPCA, in newly constructed buildings included within the statute.

85.   The gas ban does not qualify for any of EPCA's exemptions from preemption because:

a.   New York has not received—and is not eligible for—a waiver of preemption;

b.   The gas ban does not set objectives in terms of total consumption of energy;

c.   It does not permit builders to select items otherwise acceptable under federal regulations whose combined energy efficiencies meet an objective for total energy consumption, but rather requires a particular category of items (electric appliances) while it precludes other categories of items (gas appliances);

d.   It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards because it gives no credit for (and indeed bans) gas appliances no matter their efficiency; and

e.   It bans all gas appliances, even when those appliances meet the federal efficiency standards.

86.   Plaintiffs and their members will be irreparably harmed if the gas ban becomes effective and is enforced.  Plaintiffs and their members have already experienced and will continue

to face economic injuries, including lost sales and lost customers and ultimately the demise of certain businesses or lines of business; their business planning, infrastructure investments, hiring decisions, jobs, and livelihoods are and will be affected; and they face compliance burdens associated with the gas ban.

87.     Plaintiffs and their members have no adequate remedy at law for these irreparable harms.  Unless the Defendants are enjoined from effectuating and enforcing the gas ban, Plaintiffs and their members will continue to be denied their legal rights.

88.     There will be no significant harm to Defendants from an injunction because Defendants have no legitimate interest in enforcing an invalid law.  The balance of harms thus favors injunctive relief.

89.     An injunction is also in the public interest.  The public interest is not served by enforcing invalid laws.  Moreover, EPCA embodies a strong public interest in the uniform national regulation of energy conservation and use policy, encouraging diverse domestic supply of energy, and protecting consumer choice, all of which is undermined by conflicting state regulation of these matters, exemplified by New York's gas ban.

90.     Plaintiffs therefore request that the Court (i) declare that the gas ban is preempted by EPCA and (ii) enjoin Defendants from enforcing the gas ban.

## REQUESTED RELIEF

91.     Plaintiffs therefore request that the Court award the following relief:

    a.     a declaratory judgment under 28 U.S.C. § 2201(a) that the gas ban, N.Y. Energy § 11-104(6)-(8) and N.Y. Exec. § 378(19), is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

b.  a permanent injunction enjoining Defendants from enforcing or attempting to enforce the gas ban, N.Y. Energy § 11-104(6)-(8) and N.Y. Exec. § 378(19), including through the adoption of an Energy Code, Building Code, or other regulations embodying those provisions;

c.  costs of this suit, including reasonable attorneys' fees; and

d.  such other and further relief as the Court may deem just and proper.

Dated: October 12, 2023                    Respectfully submitted,

*/s/ Sarah O. Jorgensen*
Sarah O. Jorgensen (NDNY Bar No. 704794)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1201 West Peachtree St., Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
sjorgensen@reichmanjorgensen.com

Courtland L. Reichman (*pro hac vice* forthcoming)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
creichman@reichmanjorgensen.com

Caroline M. Walters (NDNY Bar No. 704759)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
400 Madison Ave., Suite 14D
New York, NY 10017
Telephone: (212) 381-1965
cwalters@reichmanjorgensen.com

Brian C. Baran (*pro hac vice* forthcoming)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
1909 K St. NW, Suite 800
Washington, DC 20006
Telephone: (202) 864-7310
bbaran@reichmanjorgensen.com

*Attorneys for Plaintiffs*