**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

MULHERN GAS CO., INC., et al.,

                Plaintiffs,

              v.

WALTER T. MOSLEY, in his official
capacity as Secretary of State,

                Defendant.

Case No. 1:23-cv-01267 (GTS/CFH)

**DEFENDANT'S MEMORANDUM IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT– FED. R. CIV. P. 56**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

STATUTORY BACKGROUND ....................................................................................... 4

A.  New York's Climate Leadership and Community Protection Act ................................ 4

B.  New York's Energy and Executive Law Amendments ................................................. 4

C.  The Energy Policy and Conservation Act (EPCA) ...................................................... 5

D.  The Natural Gas Act of 1938 ....................................................................................... 7

STANDARD OF REVIEW .............................................................................................. 7

ARGUMENT .................................................................................................................... 8

    I.  Plaintiffs' Facial Challenge Fails Due to Overbreadth. ............................................. 9

    II.  EPCA Does Not Preempt the 2023 Amendments or the Proposed
        Regulations. ........................................................................................................... 10

        A.  EPCA's technical provisions are narrowly crafted to create a
            framework to reduce the energy consumption of defined covered products. ...... 11

        B.  EPCA's focused preemption provision prohibits state and local
            regulation of an individual appliance's energy consumption. .............................. 12

        C.  The challenged New York laws do not regulate appliance energy
            consumption within the meaning of EPCA. .......................................................... 14

    III.  The Court Should Reject Plaintiffs' Flawed Reading of Section 6297(c). ............. 16

        A.  Plaintiffs misstate and disregard EPCA's key provisions. ................................... 16

        B.  Plaintiffs' theory of EPCA preemption is inconsistent with the statute's
            structure, purpose and technical subject matter. ................................................. 19

        C.  The word "concerning" in Section 6297(c) is not limitless and must be
            understood within the context of the statute. ...................................................... 21

**D. Section 6297's exceptions provisions confirm the narrow scope of preemption under Section 6297(c).** ...................................................... **23**

**IV. Plaintiffs Are Not Entitled to Declaratory and Injunctive Relief.** ........................... **25**

**CONCLUSION** .............................................................................................................. **28**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adirondack Cookie Co. Inc. v. Monaco Baking Co.*,
   871 F. Supp. 2d 86 (N.D.N.Y. 2012) .................................................................................25

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev.*
   *Comm'n ("ACRI")*,
   410 F.3d 492 (9th Cir. 2005), cert. denied, 547 U.S. 1205 (2006) ................................ *passim*

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .............................................................................................................8

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
   No. 117CV598BKSCFH, 2022 WL 4333555 (N.D.N.Y. Sept. 19, 2022) ...........................26

*Art & Antique Dealers League of Am., Inc. v. Seggos*,
   121 F.4th 423 (2d Cir. 2024) .............................................................................................17

*Ashcroft v. Mattis*,
   431 U.S. 171 (1977) ...........................................................................................................25

*Bates v. Dow Agrosciences, L.L.C.*,
   544 U.S. 431 (2005) .............................................................................................................8

*Bimber's Delwood, Inc. v. James*,
   496 F. Supp. 3d 760 (W.D.N.Y. 2020) ................................................................................3

*Bldg. Indus. Ass'n v. Wash. State Bldg. Code Council*,
   683 F.3d 1144 (9th Cir. 2012) ...........................................................................................24

*Cal. Rest. Ass'n v. City of Berkeley*,
   89 F.4th 1094 (9th Cir. 2024) ....................................................................................... *passim*

*Cmty. Hous. Improvement Program v. City of New York*,
   59 F.4th 540 (2d Cir. 2023) ............................................................................................9, 10

*Dan's City Used Cars, Inc. v. Pelkey*,
   569 U.S. 251 (2013) ........................................................................................................10, 22

*Davis v. Mich. Dep't of Treasury*,
   489 U.S. 803 (1989) ...........................................................................................................11

*Do No Harm v. Pfizer Inc.*,
   646 F. Supp. 3d 490 (S.D.N.Y. 2022), aff'd, 96 F.4th 106 (2d Cir. 2024) ...........................27

*Dolan v. U.S. Postal Serv.*,
   546 U.S. 481 (2006) .................................................................................18

*Dubin v. United States*,
   599 U.S. 110 (2023) .................................................................................22

*Duncan v. Walker*,
   533 U.S. 167 (2001) .................................................................................17

*Fed. Power Comm'n v. S. Cal. Edison Co.*,
   376 U.S. 205 (1964) ...................................................................................7

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
   365 U.S. 1 (1961) .......................................................................................7

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
   554 U.S. 33 (2008) ...................................................................................13

*Harlen Assocs. v. Inc. Vill. of Mineola*,
   273 F.3d 494 (2d Cir. 2001) .....................................................................26

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ...................................................................................22

*Howlan v. Hireright Sols., Inc.*,
   No. 6:10-CV-1094 MAD/ATB, 2011 WL 2975515, at *4 (N.D.N.Y. July 21,
   2011) .........................................................................................................27

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .................................................................................25

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ...........................................................................10, 12

*Porter v. Nussle*,
   534 U.S. 516 (2002) .................................................................................13

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
   582 F.3d 244 (2d Cir. 2009) .....................................................................25

*Project Release v. Prevost*,
   722 F.2d 960 (2d Cir. 1983) .......................................................................8

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
   579 U.S. 115 (2016) .................................................................................17

*Rutledge v. Pharm. Care Mgmt. Ass'n*,
   592 U.S. 80 (2020) ...................................................................................24

*S. Bay United Pentecostal Church v. Newsom*,
  140 S. Ct. 1613 (2020)...............................................................................................9

*S. Coast Air Quality Mgmt. Dist. v. F.E.R.C.*,
  621 F.3d 1085 (9th Cir. 2010) ...................................................................................7

*St. Pierre v. Dyer*,
  208 F.3d 394 (2d Cir. 2000)......................................................................................27

*Sullivan v. Stroop*,
  496 U.S. 478 (1990)............................................................................................13, 21

*Turkiye Halk Bankasi A.S. v. United States*,
  598 U.S. 264 (2023)..................................................................................................11

*U.S. v. Dauray*,
  215 F.3d 257 (2d Cir. 2000)......................................................................................21

*United States v. George*,
  266 F.3d 52 (2d Cir. 2001)........................................................................................13

*United States v. Morton*,
  467 U.S. 822 (1984)..................................................................................................19

*United States v. Salerno*,
  481 U.S. 739 (1987)..............................................................................................2, 8, 9

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013)..................................................................................................11

*Van Buren v. United States*,
  593 U.S. 374 (2021)............................................................................................12, 13

*Virginia Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) (Ginsburg, J., concurring) .......................................................15

*Wash. State Grange v. Wash. State Rep. Party*,
  552 U.S. 442 (2008)....................................................................................................9

*West Virginia v. EPA*,
  597 U.S. 697,744 (2022) (Gorsuch, J., concurring)..................................................10

*Wyeth v. Levine*,
  555 U.S. 555 (2009)..................................................................................................22

## CONSTITUTIONS

Tenth Amendment ...........................................................................................1, 3, 9

v

**FEDERAL STATUTES**

Declaratory Judgment Act, 22 U.S.C. § 2201(a) ..........................................................................25

Energy Policy and Conservation Act, 42 U.S.C. §  6201, *et seq.* ......................................... *passim*

42 U.S.C.
  §§ 6291(3)-(4) .......................................................................................23
  § 6291(4) ................................................................................ 17, 19-20
  §§ 6291(4),(5),(6) .................................................................................16
  § 6291(6) ...........................................................................................15, 17
  §§ 6291-6299 .........................................................................................5
  §§ 6291-6317 .......................................................................................11
  § 6292.....................................................................................................2
  § 6292(a) ................................................................................................9
  § 6293(b)(3) ........................................................................................20
  §§ 6294(a)(2)(I), 6296(a) ...............................................................20
  § 6295......................................................................................12, 18
  § 6295(a) ..............................................................................................18
  § 6295(o)(4) ........................................................................................18
  § 6297(a)(2) ..........................................................................................8
  § 6297(c) ...................................................................................... *passim*
  § 6297(d)(1)(A)...................................................................................23

Natural Gas Act of 1938, 15 U.S.C.
  § 717 *et seq.* .................................................................................... 7-8

**STATE STATUTES**

N.Y. Climate Leadership and Community Protection Act...................................................4

N.Y. Energy Law
  § 11-104(7)......................................................................................1, 4

N.Y. Energy Law
  § 11-104(6)(b) ..........................................................................1, 4, 26

N.Y. Executive Law
  § 378(19)(a) ..............................................................................1, 4, 26

N.Y. Executive Law
  § 378-19(b)-(f) ...............................................................................1, 4

New York State Energy Law and Executive Law Amendments
  (2023 Amendments).................................................................... *passim*

New York Environmental Conservation Law § 75-0101(7)...........................................................4

New York Environmental Conservaton Law § 75-0103(11),(13) .................................................4

**FEDERAL REGULATIONS**

10 C.F.R. 430.2 ...........................................................................................................................9

47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982) ...............................................................................8

**STATE REGULATIONS**

6 N.Y.C.R.R. pt. 496......................................................................................................................4

21 N.Y.C.R.R. § 509.15..................................................................................................................9

**RULES**

Fed. R. Civ. P. 56(a) .....................................................................................................................7

**MISCELLANEOUS AUTHORITIES**

Rep. No. 100-6, at 4 (1987), *reprinted in* 1987 U.S.C.C.A.N. 52 ...............................................7

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...........................11, 21

Inflation Reduction Act of 2022 ................................................................................................28

2019 N.Y. ch. 106, §§ 6,8 .............................................................................................................4

New York Scoping Plan,
      available at https://climate.ny.gov/resources/scoping-plan/ .......................................4

## PRELIMINARY STATEMENT

In May 2023, pursuant to its police powers reserved under the Tenth Amendment and consistent with its long-standing authority to regulate the intrastate distribution of natural gas and other utilities under the Natural Gas Act of 1938 (15 U.S.C. §§ 717 *et seq*.), the New York State Legislature enacted amendments (the "2023 Amendments") to the State Energy Law and the State Executive Law to further the State's efforts to address the serious threats that climate change poses to human health and the environment in New York. N.Y. Energy Law § 11-104(6)(b); N.Y. Executive Law § 378-19(a). The 2023 Amendments direct the New York State Fire Prevention and Building Code Council ("Code Council") to incorporate restrictions on "the installation of fossil-fuel equipment and building systems" in construction of certain types and sizes of new buildings into the Uniform Fire Prevention and Building Code and the State Energy Conservation Construction Code ("the Codes"). *See* Energy Law § 11-104(7) and Exec. Law § 378(19)(b)-(f). But as the Court has recognized, the 2023 Amendments do not themselves impose restrictions that are enforceable against Plaintiffs; any restrictions will become operative and enforceable in New York only if and when the proposed restrictions are incorporated into the Codes. Dkt. No. 28 at 12.

Notwithstanding the absence of final agency action required to make the proposed restrictions legally effective and enforceable, Plaintiffs move the Court for advisory declaratory relief and anticipatory injunctive relief. Dkt. No. 37-1 at 15-17. The Court should decline to reach Plaintiffs' motion and should enter judgment for Defendant for the reasons stated in Defendant's Motion for Judgment on the Pleadings. Dkt. No. 38-1. But if considered, Plaintiffs' motion should be denied. First, the motion fails at the threshold level because Plaintiffs bring a facial challenge but cannot show that the proposed restrictions would be unconstitutional in all

applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987). Second, the motion fails on its merits because it is based on two key errors: 1) Plaintiffs' misreading of the relevant preemption provision in the Energy Policy and Conservation Act ("EPCA"); and 2) Plaintiffs' mischaracterization of the New York laws they challenge.

Section 6297(c) of EPCA preempts "State regulation[s] concerning the energy efficiency, energy use, or water use" of a specified list of consumer products, consisting largely of appliances (*see*, 42 U.S.C. § 6292), if the U.S. Department of Energy ("DOE") has set a corresponding "energy conservation standard" for those products. 42 U.S.C § 6297(c). Ignoring both the federalism canon and the statute's defined terms, Plaintiffs transform this provision into a bar on virtually any exercise of state police power that has any form of relationship to appliances' "energy use" in the broadest conceivable sense. But "energy use" has a specific meaning in EPCA that limits the reach of Section 6297(c) to just state regulations – unlike the laws challenged here – that would require appliance manufacturers to design their products to meet anything other than the applicable DOE standard. *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, ("*ACRI*") 410 F.3d 492, 500 (9th Cir. 2005), *cert. denied,* 547 U.S. 1205 (2006).

Plaintiffs are equally off the mark in characterizing the challenged laws as a "gas ban" that would eliminate all gas appliances in New York when, in fact, the proposed provisions are not limited to gas, will not apply to existing buildings and, as Plaintiffs concede, will include exemptions for various classes of new buildings. Dkt. No. 1 at ¶¶ 47-48. But Plaintiffs' foundational error is their conflation of restrictions on the *type* of energy with restrictions on the *quantity* of energy. If adopted, the proposed New York regulations will restrict the *type* of equipment and infrastructure to be used in some new construction, but will not require appliance

manufacturers to design their products – whether powered by electricity or fossil fuel – to meet anything other than DOE standards regarding the *quantity* of energy used by those appliances. Thus, EPCA preemption is not triggered here.

Plaintiffs point to a Ninth Circuit panel ruling that mirrors their mistaken expansion of the scope of Section 6297(c), *Cal. Rest. Ass'n v. City of Berkeley,* 89 F.4th 1094, 1103 (9th Cir. 2024), but that decision is not controlling here and is simply wrong. As the judges dissenting from denial of *en banc* review in that case stated: the panel erred by misinterpreting "the statute's key terms to have colloquial meanings instead of the technical meanings required by established canons of statutory interpretation." *Id. at* 1119-20 (9th Cir. 2024). And amicus filer DOE, the agency that implements Section 6297 through its preemption waiver process, confirmed the "settled understanding" that EPCA preempts only state regulations that "establish energy conservation standards and their equivalents," not state regulations aimed at "health and safety, that have only a secondary and incidental effect on the efficiency or energy use of covered products." Brief for the United States in Support of Appellee at 26-27, *Cal. Rest. Ass'n,* 89 F.4th 1094 (No. 21-16278), 2022 WL 433159, at *26-27.

In sum, Plaintiffs are right that this case "is about who decides" (Dkt. 37-1 at 1), but wrong about the subjects of that question. Congress is not implicated, so the real question is who decides how New York uses its police powers to protect public health, the Legislature or a coalition of private interests advocating for their own economic advantage? The answer is clear: when addressing a major public health threat, such as the severe threats to human health and the environment posed by climate change, a state's "Tenth Amendment police and public health powers are at a maximum." *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 772

(W.D.N.Y. 2020) (citations omitted). Thus, if the Court reaches Plaintiffs' motion, it should deny the motion and enter judgment for Defendant.

## STATUTORY BACKGROUND

### A. New York's Climate Leadership and Community Protection Act

Finding that the serious effects of "[c]limate change [are] adversely affecting economic well-being, public health, natural resources, and the environment of New York," the New York Legislature enacted the Climate Leadership and Community Protection Act ("Climate Law") in 2019, directing state agencies to achieve substantial "reduce[d] greenhouse gas emissions . . . [which] are necessary to avoid the most severe impacts of climate change." 2019 N.Y. ch. 106, § 1. The Climate Law establishes "Statewide greenhouse gas emission limits" required by years 2030 and 2050, and a "Scoping Plan" to ensure the necessary actions are taken to attain those limits. New York Environmental Conservation Law ("ECL") §§ 75-0107(1), 75-0103(11),(13); *see* 6 N.Y.C.R.R. Part 496. The Scoping Plan identifies New York's "building sector [as] the largest source of [greenhouse gas] emissions in 2019, responsible for 32% of emissions statewide." Scoping Plan at 175; *see* 2019 N.Y. ch. 106, § 8.[1]

### B. New York's Energy and Executive Law Amendments

The 2023 Amendments expressly support achievement of the explicit "greenhouse gas reduction requirements set forth within [the Climate Law]" by directing that the Codes be amended "on or after" December 31, 2025, to prohibit "the installation of fossil fuel equipment and building systems" in certain sizes of new buildings, subject to exemptions for certain types of buildings or activities. N.Y. Energy L. § 11-104(6)(b),(7); N.Y. Exec. Law § 378(19)(a),(b)-(f).

---

[1] The full Scoping Plan is available at https://climate.ny.gov/resources/scoping-plan/

Notably, those statutes do not themselves impose any prohibitions and are not enforceable; any future restrictions will become operative and enforceable only if and when the Code Council takes final action to incorporate the proposed restrictions into the Codes. Dkt. No. 28 at 12; *see* Dkt 38-1 at 3-5.

### C.  The Energy Policy and Conservation Act (EPCA)

EPCA, 42 U.S.C. § 6201, *et seq.*, as amended, was enacted to conserve energy through conservation programs and improved efficiency for certain types of products and appliances. *Id.* at § 6201(4),(5). To achieve those objectives, EPCA authorizes DOE to prescribe nationwide "energy conservation standard[s]" for numerous "covered product[s]," which include "consumer products" specified in the statute. *Id.* at §§ 6291(1),(2),(6); 6295(a).[2] EPCA is a highly detailed, technical statute, and Congress used precise technical language to define its key terms.

Under EPCA, an "energy conservation standard" is a product-specific "design requirement" or "performance standard which prescribes a minimal level of energy efficiency or a maximum quantity of energy use . . . for a covered product, determined in accordance with test procedures under [42 U.S.C.] section 6293." *Id.* at § 6291(6). "Energy" means either "electricity, or fossil fuels." *Id.* at § 6291(3). "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." *Id.* at § 6291(4). "Energy efficiency" incorporates the term "energy use" and means "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293." *Id.* at §

---

[2] EPCA regulates consumer products, *see* 42 U.S.C. §§ 6291-6299, and industrial equipment, *id.* at §§ 6311-6317, in a substantially similar manner. For convenience, this brief cites provisions applicable to consumer products. *See ACRI,* 410 F.3d at 496 n.2 (taking similar approach).

6291(5). Both "energy efficiency" and "energy use" are quantitative "measure[s] of energy consumption." *Id.* at § 6291(8).

EPCA's test procedures, which, as described above, determine the "energy efficiency" or "energy use" prescribed in an energy conservation standard, are established by DOE and "measure energy efficiency [or] energy use . . . of a covered product during a representative average use cycle or period of use." *Id.* at § 6293(b)(3). In order to offer products for sale, manufacturers of covered products must use these test procedures to certify to DOE that their products, *as manufactured*, comply with applicable energy conservation standards, and then label those products accordingly. *See id.* at §§ 6295(s), 6296(a).

"Energy efficiency" and "energy use" are thus objective, quantitative values established by test procedures *before* covered consumer products are ever sold or actually used by consumers. *See id.* at 6297(g) (distinguishing the "energy efficiency" and "energy use" required under the statute from that "achieved or . . . not [] exceeded under conditions of actual use"). EPCA's definition of "consumer product" establishes that energy conservation standards prescribed under the statute for "such article[s]" are fixed measures of an appliance's energy efficiency or energy use *as manufactured,* regardless of actual appliance use or nonuse by purchasers, as "consumer product" is defined "without regard to whether such article . . . is in fact distributed in commerce for personal use or consumption by an individual." *Id.* at § 6291(1).

By employing these technically defined terms, EPCA subjects covered products exclusively to DOE's uniform nationwide energy conservation standards. The statute correspondingly uses these same specific terms to preempt state or local "regulation concerning the energy efficiency [or] energy use" of covered products for which a federal "energy conservation standard" is in effect. *Id.* at § 6297(c). The reason for EPCA's preemption

provision is to allow manufacturers to design and produce each of their covered products to meet one "energy conservation standard," *i.e.*, one "minimal level of energy efficiency or maximum quantity of energy use." *Id.* at § 6291(6). Congress' intent was to "counteract the systems of separate state appliance standards" that imposed on manufacturers "a growing patchwork of differing state regulations which would increasingly complicate their design, production and marketing plans." *ACRI,* 410 F.3d at 500 (quoting S. Rep. No. 100-6, at 4 (1987), *reprinted in* 1987 U.S.C.C.A.N. 52, 54-55). Put simply, EPCA's preemption provision serves the limited purpose of preventing States and localities from attempting to do at their level what DOE does at the federal level.

### D. The Natural Gas Act of 1938

The Natural Gas Act of 1938, 15 U.S.C. § 717 *et seq.*, established clear jurisdictional boundaries between interstate and intrastate regulation of natural gas. *Fed. Power Comm'n v. S. Cal. Edison Co.,* 376 U.S. 205, 215, (1964) ("Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction."). The Natural Gas Act specifically exempted from federal regulation the "local distribution of natural gas." *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 6 (1961). Thus, "the history and judicial construction of the Natural Gas Act suggest that all aspects related to the direct consumption of gas . . . remain within the exclusive purview of the states." *S. Coast Air Quality Mgmt. Dist. v. F.E.R.C.*, 621 F.3d 1085, 1092 (9th Cir. 2010).

### STANDARD OF REVIEW

Courts grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts resolve factual ambiguities and draw reasonable inferences against

the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). And in a case presenting a facial constitutional challenge that "turns on a purely legal question," (Dkt. 37-1 at 2), it is appropriate for the Court to enter summary judgment for the non-moving party when it rejects the moving party's legal theory. *Project Release v. Prevost*, 722 F.2d 960, 964 n.7, 969 (2d Cir. 1983); 10A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2720.1 (4th ed. 2024). Thus, if the Court reaches Plaintiffs' motion, it should enter summary judgment for Defendant.

## ARGUMENT

Plaintiffs' motion fails at both the threshold level and on its merits. First, as set forth in Defendant's motion for judgment on the pleadings, this case is not justiciable.[3] Second, Plaintiffs state a purely facial challenge (Dkt. No. 1 at ¶ 41) but cannot meet their burden of showing that "no set of circumstances exists under which the [challenged laws] would be valid." *United States v. Salerno*, 481 U.S. at 745. However, to the extent the Court considers the merits, Plaintiffs' preemption claim cannot stand. Nothing in EPCA overrides the Natural Gas Act or otherwise requires that states provide natural gas connections to buildings. Nor, as DOE has interpreted the statue for decades, does EPCA disable a state's police powers to prohibit items that threaten public health. *See* 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982). Plaintiffs reach that result only by ignoring statutory language to inflate the scope of Section 6297(c)'s preemptive effect while also mischaracterizing the purpose and effect of the New York laws they challenge. The Court should

---

[3] Underscoring the prematurity here, the challenged 2023 Amendments fall outside the scope of Section 6297(c)'s preemption because they are not a "State regulation" as defined in EPCA, which includes "a law, regulation, or other requirement of a State." 42 U.S.C. § 6297(a)(2). While the 2023 Amendments are "laws," the key aspect of the definition is that the laws impose a "requirement." "A requirement is a rule of law that must be obeyed," *Bates v. Dow Agrosciences L.L.C.* 544 U.S. 431, 445 (2005), a condition the Court recognized is absent here, *i.e.,* the 2023 Amendments impose no requirements on Plaintiffs. Dkt. No. 28 at 12.

therefore deny this motion and enter judgment for Defendant. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Tenth Amendment public health actions "should not be subject to second-guessing.")

I.    **Plaintiffs' Facial Challenge Fails Due to Overbreadth.**

The preemption in Section 6297(c) applies exclusively to a defined list of "covered products" (*see* 42 U.S.C. § 6292(a)), but the scope of the 2023 Amendments and the proposed regulations directed by the amendments is not limited to EPCA covered products. A Court order striking down the 2023 Amendments and/or proposed regulations as facially invalid – the relief Plaintiffs' request – would thus be overbroad because Plaintiffs cannot show that the challenged laws will be "unconstitutional in all [] applications." *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023) (citing to *United States v. Salerno*, 481 U.S. at 745; *Wash. State Grange v. Wash. State Rep. Party,* 552 U.S. 442, 451 (2008) (rejecting facial challenge to Washington ballot law and observing that "[f]acial challenges are disfavored" because they "short-circuit the democratic process.")).

For example, New York has adopted a regulation that sets energy efficiency standards for "heating gas fireplaces," *i.e.*, fireplaces that are not just decorative but are intended to provide heat and are fueled by natural gas or propane. 21 N.Y.C.R.R. § 509.15. Those specific types of products are not EPCA "covered products" because they fall outside the scope of DOE's efficiency standards for decorative hearth products that do not provide heating, *see* 10 C.F.R. 430.2, meaning that New York's heating gas fireplaces regulation does not trigger EPCA preemption. Accordingly, since Section 6297(c) does not preempt New York's direct regulation of heating gas fireplaces' energy efficiency, it correspondingly cannot preempt application of the 2023 Amendments and/or the proposed regulations directed by those amendments to heating gas fireplaces. A court order declaring the 2023 Amendments and/or the proposed regulations

9

facially invalid due to the preemptive effect of Section 6297(c) would thus go too far, because it would block New York from using its police power to take an unambiguously non-preempted action: restricting installation of heating gas fireplaces in new construction. Plaintiffs' purely facial challenge (Dkt. No. 1 at ¶ 41) thus fail to meet *Salerno's* "high bar" and their complaint should be dismissed. *Cmty. Hous. Improvement Program v. City of New York,* 549 F.4th at 548.

## II.     EPCA Does Not Preempt the 2023 Amendments or the Proposed Regulations.

In preemption cases, courts "start with the assumption that the historic police powers of the States were not to be superseded by [federal laws] unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citations and internal quotation marks omitted); *see also West Virginia v. EPA*, 597 U.S. 697,744 (2022) (Gorsuch, J., concurring) (courts must be "certain of Congress's intent" before finding that it legislated "in areas traditionally regulated by the States" (citations omitted)). Where "Congress has superseded state legislation by statute," a court's "task is to identify the domain expressly pre-empted." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (internal quotation marks and citation omitted).

Plaintiffs' preemption argument fails because they misinterpret EPCA's key provisions, ignoring defined technical terms that demonstrate Congress did not displace traditional state authority with an overbroad preemption provision. Plaintiffs cannot change EPCA's text or the regulatory regime it creates by truncating statutory definitions and replacing specified technical meanings with their own. New York's proposed laws have nothing to do with product-specific energy conservation standards, which are the linchpin of the federal regulatory regime and the object of EPCA's narrowly drawn preemption provision. Plaintiffs' position, that Congress somehow created an end-user right to operate EPCA-regulated appliances regardless of state

10

environmental and public health laws, is incompatible with the statutory text, "inconsisten[t] with the design and structure of the statute as a whole," *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 353 (2013), and contrary to basic tenets of federalism.

### A. EPCA's technical provisions are narrowly crafted to create a framework to reduce the energy consumption of defined covered products.

Under EPCA, federal energy conservation standards regulate numerous consumer appliances with precise technical language defining key terms. Appliance manufacturers, in order to sell their "consumer products," must manufacture them to meet nationally uniform "energy conservation standards." 42 U.S.C. §§ 6291(1),(6); 6295. These standards are product-specific "design requirement[s]" and "performance standard[s]" that set the maximum quantity of "energy use" or minimal level of "energy efficiency" for each EPCA-covered product, "determined in accordance with test procedures" prescribed under the statute. *Id.* at §§ 6291(4),(5), (6); 6293. Once a federal energy conservation standard becomes effective for a consumer product, EPCA preempts "State regulation concerning the energy efficiency [or] energy use . . . of such product . . . with respect to such product." *Id.* at § 6297(c). EPCA's preemption provision prohibits competing state energy conservation standards, ensuring that manufacturers are subject to only one such product-specific standard when designing and producing consumer products for sale. *See ACRI,* 410 F.3d at 500.

Courts must read the words Congress enacted "in their context and with a view to their place in the overall statutory scheme." *Turkiye Halk Bankasi A.S. v. United States,* 598 U.S. 264, 275 (2023) (quoting *Davis v. Mich. Dep't of Treasury,* 489 U.S. 803, 809 (1989)). When Congress addressed the technical subject matter of appliance efficiency it employed a high degree of technical terminology in creating EPCA's energy conservation standards program (*see generally* 42 U.S.C. §§ 6291-6317), consequently the "specialized meaning" of its provisions "is

11

to be expected," *Van Buren v. United States,* 593 U.S. 374, 388 n. 7 (2021) (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* at 73 (2012)). Applying EPCA's key terms according to the specialized meanings Congress gave them demonstrates that EPCA regulates an individual appliance's energy consumption, preempts only energy conservation standards and their equivalents for such products, and does not affect exercises of state authority like New York's statutes that do not concern individual product energy efficiency.

### B. EPCA's focused preemption provision prohibits state and local regulation of an individual appliance's energy consumption.

Congress' intent with respect to the scope of preemption is "primarily . . . discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it," as well as "the structure and purpose of the statute as a whole." *Medtronic, Inc.,* 518 U.S. at 486 (citations omitted). The text of § 6297(c), and EPCA's structure and purpose, demonstrate that the phrase "regulation concerning the energy efficiency [or] energy use" refers to regulations that prescribe the equivalent of an energy conservation standard for a covered product. First, the text of § 6297(c) manifests congressional intent to preempt only state actions focused directly on specific appliances. The provision states that once a federal "energy conservation standard established . . . . or prescribed under [42 U.S.C.] section 6295" takes effect, no "state regulation concerning the energy efficiency [or] energy use . . . *of such covered product* shall be effective *with respect to such product."* § 6297(c) (emphasis added). These words have meaning only if the state regulation operates directly on the individual product itself in the first place. Laws that regulate other activities instead of the energy efficiency or energy use of a specified covered product are not effective "with respect to such product" and not preempted.

Moreover, the objects of EPCA preemption under § 6297(c) are described with the same terms used for setting energy conservation standards under 42 U.S.C. § 6295. In both sections,

these terms are defined with the same "specialized meaning[s]," *Van Buren,* 593 U.S. at 388 n.7.

"Energy efficiency" and "energy use" are quantitative "measures of energy consumption" for a

"consumer product," "determined in accordance with test procedures" producing "test results . .

. during a representative average use cycle or period of use," and form the basis of a

performance-based "energy conservation standard" for a particular EPCA-covered appliance.

*Id.; see* §§ 6291(1),(2),(4),(5),(6),(8); 6293(b)(3). "[I]dentical words used in different parts of

the same act are intended to have the same meaning." *Sullivan v. Stroop,* 496 U.S. 478, 484

(1990) (citation omitted); *United States v. George,* 266 F.3d 52, 58 (2d Cir. 2001) (same). By

employing these same terms in the statute's preemption provision, the text and context of 42

U.S.C. § 6297(c) demonstrate that the phrase "regulation concerning the energy efficiency [or]

energy use . . . of such covered product" is intended to displace state efforts to adopt equivalent

product specific, performance-based energy conservation standards. *See ACRI,* 410 F.3d at 500.

The title of EPCA's preemption provision also confirms that Congress intended to

preempt only state regulations that function as energy conservation standards. Section 6297(c) is

entitled "General rule of preemption for energy conservation standards when Federal standard

becomes effective for product." Section headings "cannot substitute for the operative text of the

statute," but they do provide "tools available for the resolution of a doubt about the meaning of

a statute." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. 33, 47 (2008) (quoting

*Porter v. Nussle,* 534 U.S. 516, 528 (2002)). Congress' use of the phrase "preemption for energy

conservation standards" to title a provision whose text displaces "regulation[s] concerning

energy efficiency [or] energy use," indicates that Congress viewed the two phrases as having

similar meanings. That Congress equated these two phrases is only logical given that EPCA

13

defines "energy conservation standard" to include "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use." *Id.* at § 6291(6).

### C. The challenged New York laws do not regulate appliance energy consumption within the meaning of EPCA.

Plaintiffs strain to fit New York's laws into EPCA's preemption provision, mischaracterizing the proposed restrictions as regulation of the "quantity of energy" gas appliances can use by setting a "zero energy use" standard. Dkt. 37-1 at 1,8. But Section 6297(c) applies to state regulations that compete with federal "energy conservation standards" by setting competing "performance standards" and "design requirements" for the manufacture of "consumer products" *before* they are ever "distributed in commerce." *Id.* at § 6291(1),(6). New York's proposed laws do not function as such rival standards because they are indifferent to manufacturing requirements for EPCA-covered appliances. Whether their appliances are powered by electricity or fossil fuels, manufacturers will not face any design constraints other than the federally established energy conservation standards, thus not offending "[t]he reason for" EPCA preemption. *ACRI,* 410 F.3d at 500. Instead, New York's laws address climate change impacts exacerbated by greenhouse gas emissions from the building sector, and thus fall squarely within traditional state police powers and preserved authority over gas distribution.

Put another way, Plaintiffs' argument is that a law requiring use of electric powered appliances and infrastructure in new buildings somehow impliedly sets a "zero energy use" standard for fossil-fuel powered appliances in those new buildings. (Dkt. No. 37-1 at 8).[4] But

---

[4] Amicus Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") simply parrots Plaintiffs' conclusory 'zero energy use' argument without any added explanation. (Dkt. No. 43-1 at 7.) AHRI nowhere asserts that the proposed regulations have caused or will cause any manufacturer of fossil-fuel powered appliances to attempt to design products to meet the purely theoretical 'zero energy use' efficiency standard or any standard other than the applicable DOE standard. Nor, as a practical matter, would a manufacturer of fossil-fuel powered appliances have

this "zero energy use" argument is divorced from EPCA's text and the program of energy conservation standards it creates. Congress set the bounds of "energy use" according to a given product's actual levels of operation determined through testing, not *whether* the product is in fact operated. For example, a gas appliance placed in a building with no gas hook-up will simply never be used. But that reality does not create a *standard* governing how much energy the appliance could use if it were put into operation, *i.e.*, "zero" is not a "performance standard" or "design requirement," 42 U.S.C. § 6291(6), prescribed for manufacturing the appliance. And the proposed regulations clearly do not require any gas appliance to operate—*i.e.*, to perform useful work—on "zero" gas.

Under the regime Congress established, appliances must meet energy conservation standards before they go to market, and an appliance's "energy use," as defined in EPCA, has nothing to do with the *availability* of a particular energy source at a particular site. Laws like New York's, which upon taking effect would make some sites unavailable for certain appliances pursuant to the State's traditional police powers and intrastate gas distribution authority, but say nothing about the quantity of energy these appliances are *designed* to consume, are not preempted. In other words, a state regulation that limits the type of appliance available for use in a given building is not preempted by a federal energy conservation standard governing design and manufacture of that appliance. *See Virginia Uranium, Inc. v. Warren,* 587 U.S. 761, 790-91 (2019) (Ginsburg, J., concurring) ("A state law regulating an upstream activity within the State's

---

incentive to redesign their products to use less fossil-fuel than allowed under the DOE standard in hopes of qualifying their product for use under the proposed New York laws. The proposed regulations address only the type of energy used – allowing for use of electricity-powered appliances – leaving it to DOE to set the energy efficiency standards for allowable products.

authority is not preempted simply because a downstream activity falls within a federally occupied field.")

### III.    The Court Should Reject Plaintiffs' Flawed Reading of Section 6297(c).

Comprised of assertions untethered to statutory text and context, Plaintiffs' argument about the scope of Section 6297(c) preemption lacks merit. To reach their desired – and incorrect – conclusion, Plaintiffs repeatedly fail to provide the full, correct definitions of "energy use" and "energy efficiency" under EPCA, and omit entirely any reference to what is an "energy conservation standard." 42 U.S.C. §§ 6291(4),(5),(6).[5] These omissions and misstatements are fatal to Plaintiffs' argument because these terms are defined only once, do not vary based on their location in the statute, and give meaning to the federal "energy conservation standards" that, once established, are the predicate for preemption. Consistent application of these terms as Congress defined them demonstrates the narrow range of EPCA preemption – for appliance-specific state regulations – and allows for coherent functioning of the statute in other contexts, such as product testing and labeling. By ignoring the full, technical meanings that Congress gave for EPCA's terms, Plaintiffs' theory of preemption is simply incompatible with the statute Congress wrote.

### A.  Plaintiffs misstate and disregard EPCA's key provisions.

Plaintiffs seek to broaden the narrow field of preempted state "energy conservation standards" under 42 U.S.C. § 6297(c) by altering the meaning of "energy use," an EPCA-defined term within the "energy conservation standard" definition. *See* §§ 6291(4),(6). Their incomplete

---

[5] Plaintiffs' brief (Dkt. 37-1) makes passing reference to "standards" without ever addressing the defined statutory term, and multiple references to "energy use" and "energy efficiency" while never supplying their full definitions under EPCA.

definition renders meaningless an essential element of the statutory term. "Energy use" is not just, as Plaintiffs assert, "the quantity of energy directly consumed by a consumer product at point of use." Dkt. 1 ¶67; Dkt. 37-1 at 7. Plaintiffs, and amicus AHRI (Dkt. No. 43-1 at 7), refuse to apply the definition Congress wrote, *see* 42 U.S.C. § 6291(4), impermissibly ignoring the remainder of the definition, which is that energy use must be "*determined in accordance with test procedures under section 6293 of this title*." *Id.* (emphasis added). As the Second Circuit recently instructed, statutory preemption must be considered in light of Congress's full statutory text; although Plaintiffs and amicus AHRI omit any mention of test procedures, "Congress did not add the phrase . . . without reason." *Art & Antique Dealers League of Am., Inc. v. Seggos,* 121 F.4th 423, 429 (2d Cir. 2024).

By making no mention of these required test procedures, Plaintiffs turn "energy use" into a free-floating colloquial term instead of the technically-defined measurement that Congress required when it specified that "energy use" is a value "determined in accordance with test procedures under section 6293." *Id.* Under EPCA those "test procedures" must "produce test results which measure . . . energy use . . . during a representative average use cycle or period of use." *Id.* at § 6293(b)(3). This omission from one of EPCA's key definitions violates fundamental statutory construction principles by failing to give effect to *all* of the statute. *See Duncan v. Walker,* 533 U.S. 167, 174 (2001) (courts must "give effect, if possible, to every clause and word of a statute") (citations omitted). Plaintiffs' rewritten definition of "energy use" should be discredited by this Court because "our constitutional structure does not permit [a court] to rewrite the statute that Congress has enacted." *Puerto Rico v. Franklin Cal. Tax-Free Trust,* 579 U.S. 115, 130 (2016) (citations omitted).

17

Plaintiffs demonstrate no greater statutory fidelity when they fail to acknowledge the defined meaning of "energy conservation standard" under EPCA, perhaps the most important term in a statute that seeks to improve energy efficiency for consumer products primarily through setting those very standards. *See* 42 U.S.C. § 6291(6). They disregard the technical definition in favor of referencing undefined "standards." They borrow a phrase from § 6295(o)(4), part of EPCA's Section 6295 that prescribes and authorizes multiple "[e]nergy conservation standards," to suggest that New York's laws are preempted because they create the kind of "standards" that would "result in the unavailability in the United States in any covered product type (or class) of performance characteristics." *Id.*; *see* Dkt. 37-1 at 11. But the "standard" referenced in § 6295(o)(4), like all of Section 6295's multitude of product-specific requirements, refers to "[f]ederal energy conservation standards applicable to covered products." *Id.* at § 6295(a). As such, Plaintiffs' reference to § 6295(o)(4) is inapposite because Section 6295 is about "energy conservation standards," the product-specific design and performance requirements whose meaning Plaintiffs consistently avoid and which clearly are not what the challenged New York laws call for or will accomplish.[6] By stitching together disparate phrases in EPCA and wrenching them from proper context, Plaintiffs distort the meaning of the statute to fit their theory of preemption, again violating basic statutory construction principles.[7] *See Dolan v. U.S. Postal Serv.,* 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the

---

[6] This "unavailability in the United States" argument also accentuates the hyperbole of Plaintiffs' characterization of the proposed restrictions as a "gas ban." All types of appliances will remain available for use in New York in preexisting buildings, as well as in new construction that will be exempted from or otherwise fall outside the scope of the proposed regulations.

[7] AHRI's amicus brief similarly invokes Section 6295, describing at length DOE's process for developing energy conservation standards for EPCA-covered products (Dkt. No. 43-1 at 3-5), illustrating the false comparison between New York's laws and EPCA's appliance-specific design and performance requirements.

whole statutory text, considering the purpose and context of the statute."); *United States v. Morton,* 467 U.S. 822, 828 (1984) ("We do not, however, construe statutory phrases in isolation; we read statutes as a whole.").

### B. Plaintiffs' theory of EPCA preemption is inconsistent with the statute's structure, purpose and technical subject matter.

Plaintiffs rely heavily on *Cal. Rest. Ass'n v. City of Berkley,* 89 F.4th 1094, 1101-02 (9th Cir. 2024), where the court found that EPCA confers a right to *actually use* covered products. That court fundamentally erred in two respects: 1) by employing an incomplete definition of "energy use" that omits the phrase "determined in accordance with test procedures under section 6293 of this title," *see* 42 U.S.C. § 6291(4); and 2) by relying on a colloquial meaning of the words "point of use" in that definition, finding their meaning to be "at the place where [consumer] products are used." *Cal. Rest. Ass'n,* 89 F.4th at 1101. Simply put, *Cal. Rest. Ass'n* was wrongly decided, and Plaintiffs' reliance on it is not supported by proper statutory analysis.

Indeed, as stated by nine Circuit Judges dissenting from denial of rehearing *en banc*, "[we] urge any future court that interprets [EPCA] not to repeat the panel opinion's mistakes. The opinion misinterprets the statute's key terms to have colloquial meanings instead of the technical meanings required by established canons of statutory interpretation." *Cal. Rest. Ass'n,* 89 F.4th at 1119-20. The dissenting Judges observed that, based on statutory text and legislative history, the "relevant provisions of [EPCA] are "technical provisions with a narrow scope of preemption," and they "[do] not create a consumer right to use any covered appliance." *Id.* at 1120-21. They explain how, properly interpreted based on its fully defined technical meaning and statutory context, an appliance's "energy use" is "a fixed measure that results from the manufacturing and design of the product . . . and does not depend on any given consumer's *actual* use." *Id.* at 1122 (emphasis in original).

They further explain that under 42 U.S.C. § 6291(4), "point of use" has "a well-established technical meaning that must be applied," which "measures only 'site energy,' the energy that is directly consumed by the appliance," distinguished from "source energy," which "includes all the energy measured at the point of use (the 'site energy') plus the energy required to deliver the energy to that site." *Id.* at 1123. The dissent provides six examples of how the term "point of use" is consistently used in this technical sense by industry and regulators, *see id.* at 1123-24, and is a "technical instruction to DOE and manufacturers" that "[does] not protect . . . the end-user's ability to *use* installed covered products at their intended final destinations." *Id.* at 1123 (emphasis in original, internal quotations omitted).

Perpetuating the erroneous statutory construction by the majority in *Cal. Rest. Ass'n*, Plaintiffs advance their overbroad, incorrect theory of preemption by constructing an "end-user" right under EPCA to use fossil-fueled appliances. They rely on their incomplete and inaccurate version of "energy use," omitting its "determined in accordance with test procedures" requirement to assert that the words "point of use" within § 6291(4) refer to "the place where [covered consumer] appliances are used." Dkt. 1 at ¶¶ 67-68. However, the full definition of "energy use" shows that Congress was concerned not with how much energy is consumed in a particular residence or business, but rather, with assigning to manufacturers' appliances uniform values, determined by testing them under representative conditions, so they can be labeled and marketed consistent with the statute.

Plaintiffs' tailored version of "energy use" is incompatible with EPCA's testing and labeling requirements. The statute requires manufacturers to use test procedures and produce test results "which measure . . . energy use . . . during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). Manufacturers are then required to apply labels to covered

consumer products, such as televisions and personal computers, that disclose those products' "energy use." 42 U.S.C. §§ 6294(a)(2)(I), 6296(a). If, as Plaintiffs assert, "energy use" is the quantity of energy consumed at the place where a product is *actually* used, then a manufacturer could never label the product with its "energy use" before selling it, as EPCA requires, because such measure would have to be specific to each end user. Plaintiffs' interpretation creates the kind of "absurd results" that "[a] statute should be interpreted [to] avoid." *U.S. v. Dauray,* 215 F.3d 257, 264 (2d Cir. 2000); *see Cal. Rest. Ass'n*, 89 F.4th at 1122-23.

In other words, "energy use" cannot be both the energy consumed by each covered product at the actual place where it is used, as Plaintiffs assert, and a "representative" measure as called for by the statute. The flaw in Plaintiffs' interpretation of "point of use" is further revealed by Section 6297(g), which establishes that the measure of "energy use" under EPCA is different from the quantity of energy consumed "under conditions of actual use." Rejection of Plaintiffs' strained interpretations is necessary to give consistent meaning to EPCA's defined terms across the statute's standard setting, testing, labeling, and preemption provisions. *Sullivan*, 496 U.S. at 484 ("the normal rule of statutory construction [is] identical words used in different parts of the same act are intended to have the same meaning" (internal quotations and citations omitted)); Scalia & Garner, *Reading Law* at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

### C. The word "concerning" in Section 6297(c) is not limitless and must be understood within the context of the statute.

Plaintiffs place great weight on the word "concerning" in Section 6297(c), arguing that Congress used that word "to expand preemption beyond direct or facial regulations of covered appliances." Dkt. No. 37-1 at 7-8. But since Plaintiffs' argument is that the challenged New York laws *are* a direct regulation of covered appliances (Dkt. No. 1 at ¶ 47), this asserted added

breadth does nothing to augment Plaintiffs' position. More importantly, even assuming that "concerning" adds breadth to the preemption provision, that breadth does not nullify or alter the defined statutory terms that Congress used to identify the relevant domain: here, "energy use."

As Plaintiffs acknowledge, "concerning" is the equivalent of "related to" but "the breadth of the words 'related to' does not mean the sky is the limit." *Dan's City Used Cars, Inc.*, 569 U.S. at 260. As DOE explained in its amicus brief in the *California Restaurant Association* case repudiating this same overbroad reading of the word "concerning" in Section 6297(c): "[t]he use of the word 'concerning' does 'not extend to the outer limits of its definitional possibilities' . . . to preempt every state and local regulation that might conceivably affect the amount of energy used by a particular appliance." Brief for the United States in Support of Appellee at 18, *Cal. Rest. Ass'n,* 89 F.4th 1094 (No. 21-16278), 2022 WL 433159, at *18.[8] Thus, language such as "'in relation to' . . . cannot be 'considered in isolation,'" and the Court must "'go beyond the unhelpful text and the frustrating difficulty of defining [this] key term' and look to statutory context." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (citations omitted).

When considered within the context of EPCA's defined terms, a regulation "concerns" the "energy use" of a covered product when it forces an appliance manufacturer to modify product design to meet an "energy use" standard other than the standard set by DOE. As Plaintiffs note, the purpose of EPCA preemption is to avoid "a patchwork approach" to regulating "the energy use and energy efficiency of appliances" (Dkt. No. 1 ¶¶ 2,4,5), not to

---

[8] *See Wyeth v. Levine*, 555 U.S. 555, 577 (2009) (agencies "have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

interfere with a state's exercise of police power that is "related" only in the broadest colloquial sense.

Put simply, no matter how narrowly or expansively the Court reads "concerning," the challenged New York laws will not establish restrictions on the "quantity" of "electricity," or "fossil fuels" that a covered product is designed to consume at its point of use, 42 U.S.C. §§ 6291(3)-(4), 6297(c). Therefore, those challenged laws will not require appliance manufacturers to alter the design of their appliances to meet standards other than DOE's federal standards, *i.e.*, the challenged laws do not "concern" "energy use" within the meaning of Section 6297(c) and are not preempted.

### D. Section 6297's exceptions provisions confirm the narrow scope of preemption under Section 6297(c).

Plaintiffs' final EPCA argument, that the proposed New York laws would not qualify for the exceptions to preemption under Sections 6297(d) and 6297(f), is beside the point. New York does not need an exception to Section 6297(c)'s preemption because the proposed laws will not regulate the quantity of energy used – fossil fuel or electric – by any covered product. And far from providing any support for Plaintiffs, the exceptions provisions instead reinforce the overbreadth of Plaintiffs' interpretation of Section 6297(c).

The common thread to be drawn from the exceptions provisions is that the limited purpose of Section 6297(c) is to protect manufacturers from state regulations that create, one way or another, a distinct energy conservation standard for a given class of covered products, and thereby disrupt the uniformity of the federal standard. For example, under 42 U.S.C. § 6297(d)(1)(A), the DOE Secretary has discretion to waive preemption for a state law that sets requirements "with respect to [the] energy use" of covered products if the state shows an "unusual and compelling" need, but may not grant a waiver if the Secretary finds the state

23

regulation "will significantly burden" the appliances' manufacturers, including by causing manufacturers to "redesign and produce the covered product." *Id.* § 6297(d)(3).

Similarly, a building code that falls outside the exception in subsection (f)—*e.g.*, one that requires builders to install appliances exceeding the corresponding federal efficiency standard—is preempted because it can effectively create a rival energy conservation standard. *Bldg. Indus. Ass'n v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1152 (9th Cir. 2012) (upholding building code that did not require installation of "higher efficiency products as the only way to comply with the code" under Section 6297(f)). Here, like those Washington State regulations that were found to be not preempted by EPCA, New York's proposed regulations will not create a "legal compulsion" to install "higher efficiency products." *Id*. More to the point though, the court's discussion and application of the building code exception in Section 6297(f) further illustrates that Section 6297(c)'s purpose is to protect manufacturers from state regulations that would force them to redesign their products to be more energy-efficient or energy-conservative than DOE requires.

Congress' overriding concern in crafting the exceptions provisions—the risk of competing design requirements for appliance manufacturers—also underscores the limited breadth of "concerning" in section 6297(c) because statutory objectives are a guide to the scope of preemption. *See Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020). State regulations that do not function as rival energy conservation standards and therefore do nothing to foster the burdensome "patchwork" of such standards that Congress feared, do not "concern" the energy use of covered products.

**IV.    Plaintiffs Are Not Entitled to Declaratory and Injunctive Relief.**

Finally, the Court should reject Plaintiffs' arguments regarding their entitlement to declaratory and injunctive relief. Dkt. No. 37-1 at 15. Plaintiffs are not entitled to either form of relief because the 2023 Amendments are not preempted by EPCA and because this case is nonjusticiable.

The Declaratory Judgment Act, 22 U.S.C. § 2201(a), is coextensive with Article III's case or controversy requirement and "encompasses concepts such as ripeness, standing, and the prohibition against advisory rulings." *Adirondack Cookie Co. Inc. v. Monaco Baking Co.*, 871 F. Supp. 2d 86, 91 (N.D.N.Y. 2012). Plaintiffs' premature motion calls for the Court to issue an advisory ruling and therefore fails to meet the Declaratory Judgment Act's "actual controversy" requirement. *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (internal citations omitted).

The Court should also deny Plaintiffs' motion because they have not met their burden of showing that no genuine issue of material fact exists as to their standing. Plaintiffs allege injury in the form of economic injuries, lost work, and altered business practices, but their affidavits in support of these allegations lack specific facts and rely on speculation, inadmissible hearsay, and conclusory statements. Moreover, Defendant has presented evidence showing that the harms of which Plaintiffs complain have causes unrelated to the 2023 Amendments.

A plaintiff's burden to demonstrate standing increases over the course of litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At the summary judgment stage, the plaintiff must set forth specific facts, by affidavit or otherwise, to establish that standing exists. *Id.* "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264

(2d Cir. 2009). The summary judgment evidence is construed in favor of the party opposing it. *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

First, Plaintiffs have not met their burden of showing injury because their supporting affidavits rely on speculation and inadmissible hearsay as to the causes of their alleged injury. Plaintiffs allege that the 2023 Amendments are causing: customers to turn to alternative energy sources for cooking and heating (Plaintiffs' Exs. 3 ¶8, 4 ¶4); customers to decline to purchase propane appliances because they are concerned propane and propane appliance parts will soon be unavailable (Plaintiffs' Exs. 9 ¶5, 11 ¶4); a builder to eliminate gas infrastructure that was originally proposed for a residential construction project (Plaintiffs' Ex. 10 ¶4); and a reduction in qualified job applicants (Plaintiffs' Ex. 3 ¶9, 4 ¶4, 8 ¶4). But Plaintiffs have no admissible evidence that the 2023 Amendments are causing these harms. These affiants rely on inadmissible hearsay regarding the purported reasons and motivations for the decisions and behaviors of customers, builders, and potential job applicants. Because Plaintiffs have not proffered independent, non-hearsay evidence to establish the that the 2023 Amendments have had these purported impacts, this evidence should be disregarded. *See AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 117CV598BKSCFH, 2022 WL 4333555, at *1, 4-5 (N.D.N.Y. Sept. 19, 2022).

Furthermore, three other affiants allege that they or their members will be harmed because they have started work on projects with gas infrastructure that cannot be completed before the 2023 Amendments are enforceable. Plaintiffs' Exs. 5 ¶4, 6 ¶4, 7 ¶4. However, there is no effective date for the proposed prohibitions on the installation and use of fossil-fuel equipment and building systems in certain new structures and buildings. The Legislature directed that "on or after" December 31, 2025, the Codes should be amended to include the prohibitions —the 2023 Amendments do not make the prohibitions effective on that date. Energy Law § 11-

104(6)(b) and Executive Law § 378(19)(a); Dkt. 38-1 at 1-2. The administrative rulemaking processes required for amending the Codes are ongoing, and the timing and content of any enforceable prohibitions are unknown. Dkt. No. 38-1 at 1-2. Thus, the record does not support a finding that these affiants have established harm by asserting that projects cannot be completed before prohibitions are in place. *St. Pierre v. Dyer,* 208 F.3d 394, 404–05 (2d Cir. 2000) (reversing lower court's award of summary judgment in favor of moving party where moving party relied on affidavit containing speculative statements rather than factual assertions based on personal knowledge).

Affiants representing several labor unions assert that their members will be harmed in the future because the 2023 Amendments will cost some members their jobs, result in fewer hours worked by members, cause the loss of member benefits, or lead to hiring freezes. Plaintiffs' Exs. 12 ¶4, 13 ¶4, 14 ¶4. These affiants, however, are merely speculating about what may happen to their members at some future time, under a future, not yet adopted state regulation. They offer unsupported conclusory statements that their members will be harmed without setting forth any specific facts, and as such cannot support summary judgment. *See Howlan v. Hireright Sols., Inc.*, No. 6:10-CV-1094 MAD/ATB, 2011 WL 2975515, at *4 (N.D.N.Y. July 21, 2011) (denying summary judgment where supporting affidavit "contains inappropriate conclusory assertions."). In addition, the affiants representing four labor unions fail to identify by name at least one member with standing (Plaintiffs' Exs. 12, 13, 14, 15) and thus do not support a finding that those Plaintiffs have associational standing. *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 501 (S.D.N.Y. 2022), *aff'd,* 96 F.4th 106 (2d Cir. 2024).

Defendant has presented evidence that the harms complained of by Plaintiffs can be traced to numerous factors unrelated to the 2023 Amendments. Propane sales declined across the

country prior to the enactment of the 2023 Amendments. Defendant's Statement of Additional Material Facts in Dispute at ¶¶ 1, 3. These declines occurred in states without restrictions on gas equipment and even in states with laws prohibiting local restrictions on gas use in buildings. *Id.* at ¶¶ 3-5. The reasons for declining propane sales in the Northeast include "increased prices for propane, energy conservation measures and adoption of technologies such as heat pumps." *Id.* at ¶ 2. Furthermore, the federal Inflation Reduction Act of 2022 provides rebates for households to electrify their homes and over $317,000 in rebates have been awarded in New York. *Id.* at ¶¶ 7-8. In addition, the propane industry nationwide has long struggled to hire and retain talented technicians. *Id.* at ¶ 9. Plaintiffs provide no evidence that ties the harms they complain of to the 2023 Amendments rather than these national trends in the propane industry.

## CONCLUSION

As set forth in Defendant's motion for judgment on the pleadings, the Court should dismiss the complaint without reaching this motion because this case is not justiciable. But if the Court reaches this motion for summary judgment then, for all the reasons stated above, it should deny the motion and enter judgment for Defendant.

Dated: December 10, 2024
     New York, New York

                              LETITIA JAMES
                          Attorney General of the State of New York

                        By:    */s/Gavin G. McCabe*
                                Gavin G. McCabe (Bar Roll No. 704875)
                                Timothy Hoffman
                                Laura Mirman-Heslin
                                Christopher Gore
                                Assistant Attorneys General
                                Office of the Attorney General
                                Environmental Protection Bureau
                                28 Liberty Street, 19th Floor
                                New York, NY 10005
                                Gavin.McCabe@ag.ny.gov

28