UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MULHERN GAS CO., INC. et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>WALTER T. MOSLEY, in his official capacity as New York Secretary of State,<br><br>    Defendant,<br><br>NEW YORK GEOTHERMAL ENERGY ORGANIZATION and PUSH BUFFALO,<br><br>    Intervenor-Defendants. | CIVIL ACTION NO. 1:23-cv-01267 (GTS/CFH) |

**INTERVENOR-DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... III

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .............................................................................................................................. 2

I.     EPCA PREEMPTS ONLY LAWS CONCERNING APPLIANCES' EXCESSIVE OR INEFFICIENT ENERGY USE. .......................................................... 2

II.    THIS CASE INVOLVES HEALTH AND WELFARE LEGISLATION, NOT THE ENERGY USE OF COVERED APPLIANCES. ............................................................ 7

III.   PLAINTIFFS' READING OF EPCA'S PREEMPTION CLAUSE PRODUCES ABSURD AND DANGEROUS RESULTS. ..................................................................... 11

CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**

                                                                             **Page number(s)**

*Ace Auto Body & Towing, Ltd. v. City of New York*,
    171 F.3d 765 (2d Cir. 1999) ............................................................................... 6

*Art & Antique Dealers League of Am., Inc. v. Seggos*,
    121 F.4th 423 (2d. Cir. 2024) ........................................................................ 6–7

*Bragdon v. Abbott*,
    524 U.S. 624 (1998) ........................................................................................ 5

*Cal. Rest. Ass'n v. City of Berkeley*,
    89 F.4th 1094 (9th Cir. 2024) ............................................................. 9, 10, 11

*Dan's City Used Cars, Inc. v. Pelkey*,
    569 U.S. 251 (2013) ...................................................................................... 12

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ........................................................................................ 3

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
    508 F. Supp. 2d 295 (D. Vt. 2007) ............................................................... 12

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) .......................................................................................... 6

*Huron Portland Cement Co. v. City of Detroit*,
    362 U.S. 440 (1960) ...................................................................................... 15

*Metro. Taxicab Bd. of Trade v. City of New York*,
    615 F.3d 152 (2d Cir. 2010) .................................................................... 10, 11

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ........................................................................................ 4

*New York v. Nat'l Highway Traffic Safety Admin.*,
    974 F.3d 87 (2d Cir. 2020) ............................................................................. 5

*Nat. Res. Def. Council v. Abraham*,
    355 F.3d 179 (2d Cir. 2004) ........................................................................... 7

*Queenside Hills Realty Co. v. Saxl*,
    328 U.S. 80 (1946) ........................................................................................ 15

*Univ. Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ...................................................................................... 12

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ........................................................................................ 6

**FEDERAL STATUTES**

Energy Policy and Conservation Act, 42 U.S.C. §§ 6201–6422
        42 U.S.C. § 6292(a)(9) ............................................................................ 13
        42 U.S.C. § 6297(a) .................................................................................. 5
        42 U.S.C. § 6297(b) .................................................................................. 2
        42 U.S.C. § 6297(c) .............................................................................. 2, 4

| | |
|---|---:|
| 42 U.S.C. § 6297(d) | 3 |
| 42 U.S.C. § 6297(f) | 4 |
| 42 U.S.C. § 6311(1)(J) | 14 |
| 42 U.S.C. § 6313(a)(4)(D) | 14 |
| 49 U.S.C. § 32919(a) | 10 |

**NEW YORK STATUTES AND REGULATIONS**

| | |
|---|---:|
| N.Y. Real Property Law § 239-e | 12 |
| N.Y.C. Admin. Code § 313-01 | 12 |
| N.Y.C. Loc. L. 43 (2010) | 13 |
| 6 N.Y.C.R.R. subpart 227-2 | 14 |

**FEDERAL REGULATIONS**

| | |
|---|---:|
| 10 C.F.R. pt. 430, subpt. B, app. G | 13 |
| 10 C.F.R. § 430.32(e)(1)(ii) | 11 |
| 47 Fed. Reg. 14,424-01 (Apr. 2, 1982) | 5, 6 |
| 47 Fed. Reg. 57,198 (Dec. 22, 1982) | 5, 6 |
| 62 Fed. Reg. 38,652-01 (July 18, 1997) | 8 |
| 71 Fed. Reg. 61,144-01 (Oct. 17, 2006) | 8 |
| 72 Fed. Reg. 20,586-01 (Apr. 25, 2007) | 9 |
| 75 Fed. Reg. 6474-01 (Feb. 9, 2010) | 9 |
| 76 Fed. Reg. 54,294-01 (Aug. 31, 2011) | 8 |

**OTHER AUTHORITIES**

| | |
|---|---:|
| 133 Cong. Rec. 3070 (1987) | 7 |
| EPA, EPA-600/1-77-013, Nitrogen Oxides (1977) | 8 |
| EPA, EPA/600/R-15/068, Integrated Science Assessment (ISA) for Oxides of Nitrogen – Health Criteria (2016) | 9 |
| N.Y. State Dep't of Env't Conservation, State Implementation Plan for the Infrastructure Assessment for Nitrogen Dioxide (2013) | 14 |
| Office of the Mayor, Press Release, Mayor de Blasio and DEP Announce that All 5,300 Buildings Have Discontinued Use of Most Polluting Heating Oil, Leading to Significantly Cleaner Air (Feb. 9, 2016) | 13 |
| Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*, N.Y. Times (Dec. 28, 1990) | 12 |
| S. Rep. No. 100-6 (1987) | 7 |

# PRELIMINARY STATEMENT

After decades of studies established that the pollution emitted by indoor fossil fuel combustion threatens public health as well as significantly contributing to the climate crisis, the New York Legislature acted to restrict the use of fossil fuel appliances in certain new buildings. Plaintiffs maintain that the Legislature lacked any power to do so, because in their view the state of New York may not prohibit—under any circumstance and for any reason—the operation of a single appliance covered by the Energy Policy and Conservation Act ("EPCA"). Plaintiffs thus seek to convert EPCA, a federal law aimed at standardizing energy conservation standards, into a sweeping displacement of the state's basic responsibility to protect New Yorkers.

If Plaintiffs are right, then Congress acted decades ago, silently and without debate, to strip states and cities of huge swaths of the health and welfare authority that they exercised from the days of the founding. In Plaintiffs' view, EPCA—a federal law that does not address health, safety, or pollution—preempts all state and local laws that prevent any covered appliance from operating at any time, in any location, for any reason. According to their theory, New York must allow dangerous kerosene heaters to burn in crowded buildings, ancient boilers to combust high-sulfur fuels in dense neighborhoods, and unrestricted emissions from fossil fuel appliances.

Fortunately, Plaintiffs are wrong. There is nothing in EPCA's text, structure, or decades of history that supports the sweeping preemption claim they press here. EPCA's express preemption provision bars state and local energy conservation standards that compete with federal standards. But nothing in EPCA addresses or preempts the countless state and local laws that restrict the use of certain appliances in certain locations based on reasons having nothing to do with energy conservation. Plaintiffs' contrary theory abandons any coherent and logical reading of EPCA, and their motion for judgment on this theory should be denied.

# ARGUMENT

I. **EPCA PREEMPTS ONLY LAWS CONCERNING APPLIANCES' EXCESSIVE OR INEFFICIENT ENERGY USE.**

EPCA authorizes the Department of Energy ("DOE") to regulate the design of covered appliances to prevent designs that either use too much energy in absolute terms (an "energy use" standard) or produce too little useful output relative to the energy they consume (an "energy efficiency" standard). EPCA's preemption clause is directed at state and local laws that compete with DOE's federal standards by regulating excessive or inefficient energy use at a local level. Intervenor-Defendants agree with and adopt the Secretary of State's arguments with respect to the structure, text, and context of EPCA, all of which confirm that the statute's preemption clause is sensibly directed only at the domain regulated by EPCA itself: energy conservation. Def.'s Mem. Law Opp'n Mot. Summ J. at 12–21, ECF No. 48 ("Def.'s MSJ Br."). This section offers additional support for this straightforward conclusion by describing EPCA's waiver provisions, the agency's consistent interpretation of the scope of preemption, Congress's ratification of that interpretation, and the statute's legislative history.

First, Congress confirmed that EPCA preempted only energy conservation laws by carving out specific state laws that would have been otherwise automatically preempted. *See* 42 U.S.C. § 6297(b)–(c). Each state law Congress identified constituted a competing energy conservation standard, because each directly regulated how much energy or water specific classes of covered products may use. *See, e.g.*, *id.* § 6297(b)(6) (exempting from preemption "a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets"); *id.* § 6297(c)(4) (exempting "a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992"). By contrast, Congress did not carve out existing health and safety laws barring, for

example, the use of kerosene heaters in residential buildings, because under any reasonable reading of EPCA's preemption provision, such laws are not otherwise subject to preemption.

EPCA's waiver provision points to the same sensible conclusion that the scope of EPCA preemption is coextensive with the scope of EPCA's concern: namely, laws addressing energy and water conservation. The statute allows DOE to waive preemption if, among other things, DOE finds that a local regulation is "needed to meet unusual and compelling State or local energy or water interests," such as when the "energy or water savings resulting" from an otherwise preempted law outweigh its overall costs. *Id.* § 6297(d)(1)(B), (C). Congress thus tailored the waiver standard to match EPCA's reach. Because local conservation standards are otherwise preempted, DOE is given authority to waive preemption for laws responding to unusual local conditions that result in such significant energy "savings" that they qualify for waiver. State regulations aimed at health and safety goals (such as fire safety or the avoidance of pollution), by contrast, could never fit the prescribed waiver standard. Health and safety regulations concerning air pollution, climate change, or fire safety do not necessarily produce any energy or water savings, no matter how compelling the other interests they serve.

It is highly implausible that Congress intended EPCA to preempt both state energy conservation standards as well as health and safety laws, but only authorized DOE to regulate and waive preemption of energy conservation standards. Such an interpretation would neither be "a symmetrical and coherent regulatory scheme" nor fit "all parts into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted). The more reasonable interpretation is that Congress tailored the waiver standard to match the universe of preempted regulations. It makes little sense to construe a section titled "[g]eneral rule of preemption for energy conservation standards when Federal

standard becomes effective" to preempt all local restrictions on operating appliances for reasons totally unrelated to energy conservation, particularly when DOE could not adopt competing restrictions in these unrelated fields. *See* 42 U.S.C. § 6297(c); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995) (courts look to "the objectives of the … statute as a guide to the scope of the state law that Congress understood would survive"). The scope of the waiver that Congress enacted, and its requirement of energy "savings," confirms that Plaintiffs' preemption theory is far too broad.[1]

The same logic applies to the building code sections Plaintiffs point to. *See* Pls.' Mem. Law Supp. Mot. Summ. J. at 9, ECF No. 37-1 ("Pls.' MSJ Br."). Here too, building codes that effectively mandate a certain level of energy consumption are generally preempted, but certain exceptions are available for codes that offer flexible pathways to achieving "an estimated total consumption of energy." 42 U.S.C. § 6297(f)(3)(F). Rather than supporting Plaintiffs' theory, the existence of these exemptions refutes Plaintiffs' view that EPCA bars state laws that have nothing to do with restricting energy consumption. While building codes targeting "energy consumption" and "energy efficiencies" are subject to preemption but can qualify for exemptions, *id.* § 6297(f)(3)(A), building codes that restrict the use of certain appliances on health and safety grounds plainly have nothing to do with "energy efficiencies" and are neither subject to preemption nor candidates for exemptions from preemption.

In addition to the plain text of the statute, Congress confirmed the limited scope of EPCA's preemption clause by deciding to re-enact statutory language already interpreted as restricting preemption. Before Congress enacted the 1987 preemption clause at issue here, DOE

---

[1] Plaintiffs simply ignore the key text of the waiver provision in their briefing, citing the waiver section but omitting the statutory definition of a waivable regulation as one providing exceptional energy "savings" and "efficiency." *See* Pls.' MSJ Br. at 3, 13.

4

had expressly and consistently interpreted EPCA's preemption clause as restricted to local laws aimed at energy efficiency. Congress is presumed to have incorporated these prior interpretations when it used identical language in the 1987 amendment. "As the Supreme Court has instructed, 'when administrative … interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative … interpretations as well.'" *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 98 (2d Cir. 2020) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)).

In 1982, DOE interpreted the scope of EPCA's preemption clause as it existed at that time: "The statute at section 327(a)(2) clearly provides that only those regulations which provide for 'any energy standard or other requirement with respect to energy efficiency or energy use of a covered product' will be superseded." 47 Fed. Reg. 14,424-01, 14,456 (Apr. 2, 1982) (quoting 42 U.S.C. § 6297(a)(2) (1982)). Therefore, according to the agency, "[a] rule whose purpose is other than energy efficiency[,] such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product." *Id.* Later in 1982, the agency offered further illustration of the scope of preemption: "Prohibition of hook-ups for appliances with less than a certain efficiency would be subject to preemption," because the rule effectively required all appliances to meet an efficiency standard. 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982). But a "[p]rohibition against placing oversized furnaces and air conditioners in new buildings"—a ban that does not directly regulate

efficiency or energy use, even though it prohibits any use of certain covered appliances in certain buildings—"would not be subject to preemption." *Id.*[2]

When Congress amended EPCA's preemption clause in 1987, it elected to re-use the identical phrase that the agency had interpreted in 1982. Congress had every reason to believe that this phrase would be interpreted in accord with DOE's earlier-expressed view and would, therefore, not preempt state and local regulations "whose purpose is other than energy efficiency." 47 Fed Reg. at 14,456.

Plaintiffs do not attempt to explain why Congress would use identical language in 1987 if it in fact disapproved of DOE's interpretation and meant to preempt all state laws that prevent the use of fossil fuel appliances from operating for any reason. This failure is fatal to their argument, as it contradicts the Second Circuit's clear interpretive guidance that "when Congress plants the same seed in the same soil, it can expect the same plant to grow." *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d at 98.

Finally, the statute's legislative history also confirms that Congress's concern in enacting EPCA's preemption clause was narrowly aimed at guarding against competing energy conservation standards, rather than a radical displacement of any law that restricted the use of particular appliances or fuels for unrelated reasons. *See Art & Antique Dealers League of Am.,*

---

[2] While agency interpretations are not binding, DOE's longstanding and consistent interpretation of the scope of EPCA's preemption clause is particularly persuasive because agencies "have a unique understanding of . . . how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 775 (2d Cir. 1999), *holding modified by Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136 (2d Cir. 2006) ("[T]o the extent that our reading of the safety exemption may touch upon delicate matters of public policy, this view carefully tracks the interpretation given by the U.S. Department of Transportation.").

*Inc. v. Seggos*, 121 F.4th 423, 431 (2d Cir. 2024) ("We look to this legislative history to confirm our interpretation of the text."). EPCA's appliance standards are intended to "improv[e] the energy efficiency of thirteen named home appliances that Congress determined contributed significantly to domestic energy demand, as well as any additional ones that the administrator of the Federal Energy Administration ("FEA," a precursor to [the Department of Energy]), in his discretion, determined similarly contributed to energy demand." *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004). As the Second Circuit has recounted, Congress enacted the 1987 statute that amended EPCA because "Congress also was concerned with the 'growing patchwork' of state *efficiency* standards that had developed as the result of the absence of national standards[.]" *Id.* at 187 n.3 (citing S. Rep. No. 100-6, at 4 (1987) (emphasis added).

Plaintiffs assert that "[a]llowing individual states to ban gas appliances" would undermine Congress's intent. Pls.' MSJ Br. at 12. But Congress repeatedly explained that its goal was to impose uniform efficiency standards, not to guarantee that consumers could override local health and safety laws to install any appliance in any building they desired. *See Abraham*, 355 F.3d at 187 n.3; *see also* 133 Cong. Rec. 3070 (1987) (statement of Sen. Johnston) (sponsor's description of act as having "two basic principles": "to establish efficiency standards" and "to preempt State efficiency standards"). As described in Section III *infra*, a statute that swept as broadly as Plaintiffs urge would radically alter the relationship between federal and state government and produce dangerous and absurd results. Contrary to Plaintiffs' unfounded claims, there is no indication that Congress ever contemplated doing so.

## II.   THIS CASE INVOLVES HEALTH AND WELFARE LEGISLATION, NOT THE ENERGY USE OF COVERED APPLIANCES.

To achieve a reduction in the greenhouse gas emissions and indoor air pollution that jeopardize its residents' health, New York must reduce the combustion of fossil fuels in

7

buildings. The challenged amendments reduce the indoor combustion of fossil fuels to address both the health and welfare threat posed by climate change, *see* Def.'s MSJ Br. at 4, as well as the public health consequences of air pollution. What the amendments do not do, however, is regulate the absolute quantity of energy used by appliances in New York, prescribe any energy efficiency standards, or seek to produce any energy conservation savings. As Second Circuit precedent demonstrates, the amendments at issue here are not a proxy for the energy efficiency regulation covered by EPCA, and they therefore do not concern energy use within the meaning of EPCA.

Indoor fossil fuel combustion has a significant impact on human health and can lead to a range of serious negative health outcomes, including the development and exacerbation of lung diseases (such as asthma and chronic obstructive pulmonary disease), cardiovascular disease, cognitive deficits, cancer, and death. According to the U.S. Environmental Protection Agency ("EPA"), nitrogen oxide pollution is "an inherent consequence of fossil fuel combustion." EPA, EPA-600/1-77-013, Nitrogen Oxides at 1-1 (1977). Carbon monoxide "is formed primarily by the incomplete combustion of carbon-containing fuels." 76 Fed. Reg. 54,294-01, 54,297 (Aug. 31, 2011). $PM_{2.5}$, or fine particulate matter, is mainly produced by "combustion processes and by atmospheric reactions of various gaseous pollutants." 62 Fed. Reg. 38,652-01, 38,654 n.6 (July 18, 1997); 71 Fed. Reg. 61,144-01, 61,146 (Oct. 17, 2006). These pollutants pose serious risks to human health, and the government has determined that even short-term exposure can significantly increase the risk of health problems ranging from heart disease to strokes to asthma. *See* 75 Fed. Reg. 6474-01, 6479–80 (Feb. 9, 2010); EPA, EPA/600/R-15/068, Integrated Science Assessment (ISA) for Oxides of Nitrogen – Health Criteria, at 1-17, 5-55 (2016); 72 Fed. Reg. 20,586-01, 20,586–87 (Apr. 25, 2007).

The critical importance of improving health outcomes by improving indoor air quality has led Intervenor-Defendant PUSH Buffalo to undertake several major projects that eliminate dangerous fossil fuel-burning appliances in affordable housing. *See* Declaration of Dawn Wells-Clyburn ¶¶ 4–6, ECF No. 39-4. In particular, PUSH Buffalo is committed to using only electric appliances in the properties it develops "due to advances in climate-appropriate renewable heating and cooling technologies and the resident health benefits that can be achieved by eliminating on-site combustion appliances." *Id.* ¶ 4. This is exactly what the challenged amendments now seek to accomplish statewide in certain new construction, to guarantee New Yorkers both the air quality and climate benefits that come from avoiding indoor fossil fuel combustion.

While EPCA is concerned with standards for energy conservation, a prohibition on the use of fossil fuel appliances in certain buildings based on their harmful emissions bears no inherent relationship to the quantity of energy used. The amendments at issue here thus "give[] manufacturers no reason to change the design of their fossil-fuel-burning products to meet standards higher than those prescribed by DOE. [They] simply direct[] consumers to one set of products with one set of federal efficiency standards (electric appliances) over another set of products with different federal efficiency standards (gas appliances)." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1126 (Friedland, J., dissenting). There is no inherent relationship between the energy conservation achieved by a product and the question of whether it may be used in new buildings. Electric appliances—regardless of energy consumption or efficiency—are permitted; gas-combustion appliances—regardless of energy consumption or efficiency—are prohibited. In fact, some electric appliances used in new buildings are less efficient and consume

more energy than the prohibited gas-burning alternatives. "Transitioning from fossil fuels to non-greenhouse-gas-producing energy sources may not decrease total energy consumption." *Id*.

The Second Circuit's decision in *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010) illustrates the difference between laws that effectively establish energy conservation standards—and are therefore subject to EPCA preemption—and laws like the amendments here, which do not directly or indirectly regulate energy conservation. In that decision, the Second Circuit addressed a New York City rule that incentivized the use of hybrid taxicabs by increasing "the maximum dollar amount per shift for which [such] taxis can be leased." *Id*. at 155. As the Second Circuit determined, the rule was entirely aimed at fuel efficiency: "The requirement that a taxi be a hybrid in order to qualify for the upwardly adjusted lease cap does nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* at 157. Similar to its preemption of laws relating to appliance energy conservation standards, EPCA "preempts state laws that are 'related to fuel economy standards.'" *Id.* (quoting 49 U.S.C. § 32919(a)). Therefore, because "'hybrid' is simply a proxy for 'greater fuel efficiency' . . . the rules in question directly regulate the relevant preempted subject matter." *Id.* at 158.

As the Second Circuit's analysis shows, the amendments challenged here are readily distinguishable from laws that directly or indirectly concern energy conservation standards. First, while in the taxicab case, "[t]he equivalency of the term 'hybrid' with 'greater fuel efficiency' for purposes of the new rules is self-evident," there is no such equivalency between the use of fossil fuels and the energy efficiency of appliances permissible in certain new buildings in New York. *Id.* at 157. "Indeed, some gas appliances are more efficient than electric appliances, so the ordinance may have the indirect effect of *increasing* energy consumption in new buildings in

10

some circumstances." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting) (citing 10 C.F.R. § 430.32(e)(1)(ii) (setting a more stringent standard for gas furnaces than for electric furnaces)). Second, while "imposing reduced lease caps solely on the basis of whether or not a vehicle has a hybrid engine has no relation to an end other than an improvement in fuel economy across the taxi fleets operating in New York City," the ends served by the code amendments are wholly distinct from energy efficiency. *Metro. Taxicab Bd.*, 615 F.3d at 157. As described above, the amendments produce no inherent improvement in energy usage or energy conservation. Instead, they serve different ends: reducing harmful emissions that are making New Yorkers sick and mitigating the climate crisis that threatens New York's future.

### III. PLAINTIFFS' READING OF EPCA'S PREEMPTION CLAUSE PRODUCES ABSURD AND DANGEROUS RESULTS.

Plaintiffs press an interpretation of EPCA's preemption clause that is breathtakingly expansive. Once an appliance is subject to a federal energy efficiency standard, no state or local authority can ever restrict its use in any location. *See* Pls.' MSJ Br. at 1 (asserting that EPCA preempts any law "banning an appliance or prohibiting it from using any energy"). According to Plaintiffs' theory, it makes no difference that EPCA does not authorize DOE to set standards regarding a product's effects on safety, health, wellness, or the environment, or on the suitability of a product for a particular use in a particular location. In their view, once DOE has prescribed an energy efficiency standard for a product, state and local authorities lose all power to restrict the use of that product on any ground. And because DOE has no concomitant power to take over local authority over fire safety, health, wellness, the environment, and suitability, under this theory products subject to federal energy conservation standards are effectively insulated from these unrelated forms of regulation.

Plaintiffs' claims are based on an interpretation of EPCA's preemptive clause that is radically "inconsisten[t] with the design and structure of the statute as a whole," *Univ. Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). According to Plaintiffs' view, the promulgation of a federal energy conservation guarantees the unlimited use of any EPCA-covered appliance, free from local control, under any circumstance, even though EPCA does not concern the health, safety, or environmental impacts of appliances. *See generally Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 347 (D. Vt. 2007) ("It bears noting here that EPCA expresses no environmental objective or purpose . . . ."). The "[f]ederal law does not speak to these issues." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 265 (2013). If EPCA nonetheless preempts the challenged amendments, it would appear to preempt much of the local and state authority that New Yorkers take for granted.

For example, New York has for decades judged that portable kerosene burners are too dangerous to allow for their use in dense, multi-family residential buildings throughout the state. Section 239-e of New York's Real Property Law prohibits the use of any portable kerosene heater in a multiple dwelling (defined in section 239-a(2) to mean dwellings occupied as the residence of three or more independent families and including dwelling portions of hospitals, nursing homes, and other institutions). And New York City, one of the densest areas in the country, has gone further based on local needs and long banned the use of kerosene space heaters in any home. *See* N.Y.C. Admin. Code § 313-01. Such heaters are so "highly flammable" that "fire officials confiscate[] them whenever they [a]re spotted in homes or apartments." Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*, N.Y. Times (Dec. 28, 1990) (quoting N.Y.C. Fire Department spokesman).

Under Plaintiffs' theory, EPCA preempts these appliance bans, even though EPCA has nothing to do with fire safety. In their view, all that matters is that space heaters are a covered appliance under EPCA. *See* 42 U.S.C. § 6292(a)(9). Once DOE has issued standards for this category of appliance, *see* 10 C.F.R. pt. 430, subpt. B, app. G at 1.4.4 (setting testing standards for kerosene heaters), Plaintiffs' view is that neither state nor local government may prevent the appliance from "using any fossil fuel" such as kerosene in any building—regardless of the dangers to health and welfare. Pls.' MSJ Br. at 7–8.

Moreover, if Plaintiffs' theory is correct, the promulgation of a DOE efficiency standard requires that New Yorkers forfeit not only local control over fire safety, but also state and local air quality protections specifically developed to address local pollution levels and needs. In 2010, New York City responded to the disproportionate air pollution caused by the small number of New York City buildings that combusted high-sulfur fuel oil in their boilers by barring the combustion of particular fuels in city boilers. *See* N.Y.C. Loc. L. No. 43 (2010) ("[T]he strongest predictor of particulate matter and sulfur dioxide in the air in New York City is the density of nearby buildings that burn fuel oil."). The law was immediately successful at improving New Yorkers' health and air quality, and by December 31, 2015, all buildings registered as burning the dirtiest heating oil had switched to cleaner fuels. *See* Press Release, Office of the Mayor, Mayor de Blasio and DEP Announce that All 5,300 Buildings Have Discontinued Use of Most Polluting Heating Oil, Leading to Significantly Cleaner Air (Feb. 9, 2016), https://www.nyc.gov/office-of-the-mayor/news/152-16/mayor-de-blasio-dep-that-all-5-300-buildings-have-discontinued-use-most-polluting. The result was "a substantial reduction in air pollution, which models show will prevent 210 premature deaths and 540 hospitalizations each year." *Id.*

If Plaintiffs are correct, New York City in reality had no authority to improve its air quality. Large oil-fired packaged boilers are subject to an EPCA efficiency standard. *See* 42 U.S.C. § 6313(a)(4)(D). And the City's law reduced these boilers' use of a particular fossil fuel to zero. Under Plaintiffs' theory, this efficiency standard therefore barred any restriction on the operation of the City's most dangerous boilers—even though EPCA does not grant DOE any authority to address local health and welfare, nor to restrict the types of fuels that covered products use. It is absurd to believe that Congress decided that New Yorkers should be forced to endure hundreds of excess deaths simply because DOE had promulgated an efficiency standard that did not purport to consider or decide anything about air pollution. Yet this is the premise that Plaintiffs ask the Court to endorse.

New York would likewise be stripped of its ability to implement many of the air quality improvements that we take for granted in industrial areas. New York State has for years responded to public health needs by reducing air pollutants linked to respiratory-related emergency department visits and hospital admissions. These improvements include restrictions on the use of certain industrial boilers that burn fossil fuels but lack sufficient pollution controls. *See* N.Y. State Dep't of Env't Conservation, State Implementation Plan for the Infrastructure Assessment for Nitrogen Dioxide (2013), https://www.dec.ny.gov/docs/air_pdf/no2infrasip 052013.pdf; 6 N.Y.C.R.R. subpart 227-2. But under Plaintiffs' theory, industrial boilers must be permitted to operate without restriction, regardless of air pollution, because they are a covered appliance under EPCA. *See* 42 U.S.C. § 6311(1)(J). Endorsing Plaintiffs' view would cause substantial uncertainty and jeopardize New York's efforts to meaningfully regulate dangerous air pollutants and protect the public from pollution-related health problems and premature deaths.

As these examples illustrate, Plaintiffs' theory would radically rewrite the relationship between the federal government and local authorities, without any indication that Congress could have intended such a result. A federal law aimed at conserving energy would automatically displace a staggering number of state and local laws that have nothing to do with energy conservation and everything to do with the States' traditional police powers. *See. e.g.*, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power."); *Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 82–83 (1946) ("Protection of the safety of persons is one of the traditional uses of the police power of the States. . . . It is for the legislature to decide what regulations are needed to reduce fire hazards to the minimum."). And because EPCA does not authorize DOE to grant waivers on health and safety grounds, DOE would have no authority to reinstate the countless state and local laws EPCA would displace.

## CONCLUSION

Plaintiffs' motion rests on a theory that produces absurd results, hamstrings the ability of state and local governments to protect their residents, and radically undermines settled understandings of federalism and local police powers. There is no cause for the Court to adopt this dangerous theory, because EPCA's text, structure, and history all support a much more sensible interpretation of EPCA's preemptive scope than Plaintiffs' radical view. The Court should deny Plaintiffs' motion.

DATED: December 10, 2024

                                                                       *s/Dror Ladin*
Dror Ladin
Meagan Burton
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org
mburton@earthjustice.org

*Attorneys for Intervenor-Defendants
NY-GEO and PUSH Buffalo*