**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 4

    I.   This Court Should Enjoin Enforcement of the Gas Ban Pending Appeal. ........................ 4

         A.     Plaintiffs Have a Likelihood of Success on the Merits............................................ 6

         B.     Plaintiffs Will Suffer Irreparable Harm If the Ban Is Not Enjoined...................... 12

         C.     The Balance of Harms Tips Decidedly in Plaintiffs' Favor Because There Is No Significant Harm to the Secretary from a Short Delay in Effective Date....... 18

         D.     The public interest favors preserving the status quo to allow the Second Circuit time to address the issue. ..................................................................................... 21

    II.  An Injunction Pending Appeal Is Also Warranted to Preserve the Federal Courts' Jurisdiction Given the Secretary's Apparent Position That This Case Will Become Moot When the Ban Takes Effect.............................................................................. 22

CONCLUSION.............................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Trucking Ass'ns v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ...................................................................................21

*Am. Trucking Ass'ns v. City of Los Angeles*,
    569 U.S. 641 (2013)....................................................................................................9

*Cal. Div. of Labor Standards Enf't v. Dillingham*,
    519 U.S. 316 (1997)..................................................................................................10

*Cal. Rest. Ass'n v. City of Berkeley*,
    89 F.4th 1094 (9th Cir. 2024) ........................................................................... *passim*

*Cayuga Indian Nation of N.Y. v. Pataki*,
    188 F. Supp. 2d 223 (N.D.N.Y. 2002) ...........................................................6, 8, 11

*Champion Int'l Corp. v. Brown*,
    731 F.2d 1406 (9th Cir. 1984) ..................................................................................21

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)................................................................................ *passim*

*Cooper v. U.S. Postal Serv.*,
    246 F.R.D. 415 (D. Conn. 2007).............................................................................6, 8

*DiMartile v. Cuomo*,
    2020 WL 4877239 (N.D.N.Y. Aug. 19, 2020) (Suddaby, C.J.) .................................5

*Donohue v. Paterson*,
    715 F. Supp. 2d 306 (N.D.N.Y. 2010) ....................................................................12

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*,
    733 F.3d 393 (2d Cir. 2013)......................................................................................12

*FTC v. Dean Foods Co.*,
    384 U.S. 597 (1966)..................................................................................................22

*fuboTV Inc. v. Walt Disney Co.*,
    745 F. Supp. 3d 109 (S.D.N.Y. 2024)......................................................................13

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) .................................................................................21

*Ideal Toy Corp. v. Sayco Doll Corp.*,
　302 F.2d 623 (2d Cir. 1962).................................................................................4, 11

*JTH Tax, LLC v. Agnant*,
　62 F.4th 658 (2d Cir. 2023) ......................................................................................13

*LaRouche v. Kezer*,
　20 F.3d 68 (2d Cir. 1994) ...........................................................................................5

*Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*,
　103 F. Supp. 3d 244 (N.D.N.Y. 2015)........................................................................13

*Marsh USA Inc. v. Karasaki*,
　2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) ..............................................................13

*Michael v. INS*,
　48 F.3d 657 (2d Cir. 1995).........................................................................................22

*Mohammed v. Reno*,
　309 F.3d 95 (2d Cir. 2002)..................................................................................5, 7, 11

*N.Y. Progress & Prot. PAC v. Walsh*,
　733 F.3d 483 (2d Cir. 2013).......................................................................................21

*Nat. Res. Def. Council v. U.S. Food & Drug Admin.*,
　884 F. Supp. 2d 108 (S.D.N.Y. 2012).......................................................................6, 8

*Nken v. Holder*,
　556 U.S. 418 (2009)..........................................................................................4, 6, 21

*Oneida Indian Nation of N.Y. v. Madison County*,
　376 F. Supp. 2d 280 (N.D.N.Y. 2005) ........................................................................23

*Pa. Bureau of Corr. v. U.S. Marshals Serv.*,
　474 U.S. 34 (1985)....................................................................................................22

*Pulsifer v. United States*,
　144 S. Ct. 718 (2024)................................................................................................10

*Register.com, Inc. v. Verio, Inc.*,
　356 F.3d 393 (2d Cir. 2004)..................................................................................12, 13

*RMH Tech LLC v. PMC Indus., Inc.*,
　352 F. Supp. 3d 164 (D. Conn. 2018) .........................................................................12

*Rowe v. N.H. Motor Transp. Ass'n*,
　552 U.S. 364 (2008)...............................................................................................9, 11

*Thapa v. Gonzales,*
  460 F.3d 323 (2d Cir. 2006)..................................................................5, 7

*Tom Doherty Assocs. v. Saban Ent., Inc.,*
  60 F.3d 27 (2d Cir. 1995) ..................................................................12, 13

*United States v. New York,*
  708 F.2d 92 (2d Cir. 1983) (per curiam).............................................12, 20

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
  559 F.2d 841 (D.C. Cir. 1977).....................................................................6

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008).........................................................................................5

*In re World Trade Ctr. Disaster Site Litig.,*
  503 F.3d 167 (2d Cir. 2007)......................................................................5, 7

**Statutes**

28 U.S.C. §1651.............................................................................................22, 23

28 U.S.C. § 1651(a) ......................................................................................22, 24

42 U.S.C. § 6297(d)(3)-(4) .................................................................................10

Energy Policy and Conservation Act, 42 U.S.C. §§ 6201 *et seq.* ......................3

  §6295(o)(4) ....................................................................................................10

  §6297(c) ........................................................................................................3, 9

  §6297(f)(3) .........................................................................................................9

N.Y. Energy § 11-104(6)-(8) ...........................................................................3, 19

N.Y. Exec. § 378(19) .......................................................................................3, 19

2023 N.Y. Laws c. 56, pt. RR, §6.........................................................................19

**Rules**

Fed. R. Civ. P. 62(d) ...................................................................................1, 4, 6

**Other Authorities**

11 Wright & Miller's Federal Practice & Procedure § 2904 (3d ed., updated May
  21, 2025) ...........................................................................................................4

Dep't of State, https://dos.ny.gov/event/state-fire-prevention-and-building-code-council-meeting-july-2025 (last visited Sept. 10, 2025)............................................................3

N.Y. Dep't of State, *Third Quarter Meeting of the State Fire Prevention and Building Code Council – July 25, 2025* (YouTube, July 28, 2025), https://www.youtube.com/watch?v=1WdV3ix9AgY.................................................................3

*New York: State Profile and Energy Estimators*, U.S. Energy Info. Admin (last updated Jan. 16, 2025), https://www.eia.gov/state/analysis.php?sid=NY ............................20

*State Fire Prevention and Building Code Council Meeting – July 2025*, N.Y. Dep't of State, https://dos.ny.gov/event/state-fire-prevention-and-building-code-council-meeting-july-2025 (last visited Sept. 10, 2025)..................................................3

## INTRODUCTION

Plaintiffs move under Civil Rule 62(d) for an injunction pending appeal in order to maintain the status quo while the Second Circuit considers the difficult and novel legal question this case presents. Without interim relief, New York State's gas ban will take effect January 1, 2026, wreaking irreversible havoc on Plaintiffs and their members before the Second Circuit is likely to be able to resolve Plaintiffs' appeal.

Plaintiffs' preemption claim presents a substantial case on the merits in light of the fact that the Ninth Circuit—the only court of appeals to have addressed this issue—adopted the interpretation that Plaintiffs urge here. *California Restaurant Ass'n* held that "EPCA would no doubt preempt" a law like New York's "that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1107 (9th Cir. 2024). The Ninth Circuit determined that Berkeley's ban on gas piping concerned the energy use of covered appliances because it prevented those appliances from using gas; this is indistinguishable from New York's ban on gas piping and gas appliances. On a request for rehearing en banc in the Ninth Circuit, only 8 out of 28 active judges indicated their disagreement. Here, the Court expressly rejected the Ninth Circuit's interpretation and adopted the views of the dissent from the denial of rehearing, holding that preemption extends only to energy conservation standards or to regulations that force manufacturers to redesign appliances. This interpretation rewrites the statutory text and is inconsistent with the statutory context and purpose. But the Court need not reconsider its views on the merits to provide interim relief; it need only conclude that this strictly legal issue, which will be one of first impression for the Second Circuit, presents a difficult question that warrants maintaining the status quo while the Second Circuit has time to consider it.

The balance of harms weighs sharply in Plaintiffs' favor: During the pendency of the appeal, Plaintiffs will suffer serious harms that cannot be unwound—including not only substantial

lost sales and revenues, but also the closing of businesses or lines of business, lost customers and

goodwill, lost work opportunities and layoffs of highly trained and skilled employees, and business

reorganizations including sales of assets and location changes.  These specific, imminent harms,

laid out below and in the attached declarations, cannot be undone and cannot be compensated with

monetary damages given New York's sovereign immunity.  The Secretary, by contrast, will suffer

no appreciable harm in the interim from a short extension of the effective date of New York's gas

ban.  The Secretary will bear no costs or burdens.  Nor would an injunction prevent anyone from

installing electric systems and appliances or from building using all-electric construction.  The

statute built in a delay of well over a year from its passage on May 2, 2023 until the effective date

on December 31, 2025.  This signals that the legislature did not treat the date the ban becomes

effective as an emergency, and accordingly, delaying the effective date a few months to a year

longer than the statute originally anticipated should not be seen as significant.  And it will have

only limited impact on New York's stated objectives:  The gas ban aims to address goals measured

over decades, and for the ban to have any appreciable effect on those goals especially in the short

term, New York will need to shift away from its gas-powered electric grid.

> For the same reasons, an injunction is in the public interest; it would protect Plaintiffs from

devastating harms from having to comply with a preempted law until the Second Circuit has time

to rule.  An injunction preserving the status quo pending appeal is appropriate here.

## BACKGROUND

> Plaintiffs—a coalition of small businesses, trade associations, and labor unions that rely on

the availability of natural gas appliances and systems for their and their members' livelihoods—

brought this federal preemption challenge to New York's ban on fossil fuel systems and

appliances.  Dkt. 1.  New York's gas ban is contained in two statutory provisions that require the

New York State Fire Prevention and Building Code Council (the "Council") to adopt building and

energy code provisions implementing the prohibition.  N.Y. Energy § 11-104(6)-(8); N.Y. Exec. § 378(19).  Specifically, the gas ban requires the Council to amend the Codes to prohibit "the installation of fossil-fuel equipment and building systems" in new buildings (with limited exceptions) beginning December 31, 2025.  N.Y. Energy § 11-104(6)-(8); N.Y. Exec. § 378(19).  The Council has done so; it adopted final regulations in July.  *See* Dkt. 64 at 10-11, 22-24.[1]

Plaintiffs contended that New York's gas ban is preempted by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§6201 *et seq.*, which preempts local regulations "concerning the … energy use" of covered products, *id.* §6297(c), including many common residential and commercial appliances.  As noted, the Ninth Circuit agrees with Plaintiffs' view. It held that EPCA's "plain text and structure" preempted Berkeley's ordinance that, instead of banning covered gas appliances outright, "prohibit[ed] natural gas piping in [new] buildings from the point of delivery at a gas meter, rendering the gas appliances useless."  *Cal. Rest.*, 89 F.4th at 1098.  As the Ninth Circuit recognized, "a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* at 1103.  Here, the State has banned not only the piping but also the appliances themselves. Because that ban is preempted, Plaintiffs sought declaratory and injunctive relief.

This Court rejected the Secretary's jurisdictional objections, Dkt. 64 at 20-28, but ruled for the Secretary on the merits, Dkt. 64 at 28-34; Dkt. 66.  The Court entered judgment for the

---

[1] *State Fire Prevention and Building Code Council Meeting – July 2025*, N.Y. Dep't of State, https://dos.ny.gov/event/state-fire-prevention-and-building-code-council-meeting-july-2025 (last visited Sept. 10, 2025) (meeting materials, including proposed notices of adoption of final code amendments); N.Y. Dep't of State, *Third Quarter Meeting of the State Fire Prevention and Building Code Council – July 25, 2025*, at 23:58-25:48, 41:38-43:00 (YouTube, July 28, 2025), https://www.youtube.com/watch?v=1WdV3ix9AgY (recording of meeting at which the Council voted to adopt and issue the amendments as permanent rules).

Secretary, Dkt. 67, and Plaintiffs timely appealed, Dkt. 68.

## ARGUMENT

I.    **This Court Should Enjoin Enforcement of the Gas Ban Pending Appeal.**

"While an appeal is pending from … [a] final judgment that … refuses … an injunction," Civil Rule 62(d) authorizes district courts to "grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d).  That rule codifies district courts' inherent power "to preserve the status quo" while an appeal is pending.  *See Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962).  This Court should exercise that power here to give the Second Circuit time to consider the serious legal question presented before New York's ban causes irreparable harm.

Interim relief pending appeal—whether an injunction preserving the state of affairs before the challenged action or a stay of an order that would change the status quo—serves an important purpose:  It gives a reviewing court time "to act responsibly" and "bring considered judgment to bear on the matter before it," rather than forcing a choice "between justice on the fly or participation in what may be an idle ceremony" if it comes too late to afford relief to the aggrieved party.  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (cleaned up); *see also id.* at 434 (recognizing that there is "substantial overlap" between the preliminary injunction and stay factors, "not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined"); 11 Wright & Miller's Federal Practice & Procedure §2904 (3d ed., updated May 21 2025) (Rule 62(d) "codifies the inherent power of courts to make whatever order is deemed necessary to preserve the status quo and to ensure the effectiveness of the eventual judgment.").

The Second Circuit's standard for an injunction pending appeal is "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a

stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected." *LaRouche v. Kezer*, 20 F.3d 68, 72-73 (2d Cir. 1994) (cleaned up). "As the standard makes clear, a grant of injunctive relief pending appeal does not depend solely or even primarily on a consideration of the merits." *Id.* That is consistent with the Second Circuit's "flexible standard" for evaluating the preliminary injunction factors:

> For the last five decades, this circuit has required a party seeking a preliminary injunction to show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and balance of hardships tipping decidedly toward the party requesting the preliminary relief. The "serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction.

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (cleaned up).

The Second Circuit has held that its "flexible standard" on the likelihood-of-success prong survived *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). *Citigroup*, 598 F.3d at 38. And case after case has applied the same flexible approach to stays. *See, e.g.*, *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (discussing similar factors for a stay pending appeal and noting the circuit's flexible approach); *Thapa v. Gonzales, 460 F.3d 323, 334 (2d Cir. 2006)* ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors."); *Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002)* ("The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." (cleaned up)); *DiMartile v. Cuomo*, 2020 WL 4877239, at *3 (N.D.N.Y. Aug. 19, 2020) (Suddaby, C.J.) ("The Second Circuit evaluates these [stay] factors on a sliding

scale . . . ."). As a result, an injunction is warranted when "there are serious questions going to the merits" and "the balance of hardships tips *decidedly* in [the movant's] favor. *Citigroup*, 598 F.3d at 35 (cleaned up).

Finally, that a district court has denied injunctive relief on the merits does not prevent it from granting relief pending appeal; Rule 62(d) contemplates this very setup. *See* Fed. R. Civ. P. 62(d) (court may "grant an injunction" while an appeal is pending from a "final judgment that … refuses … an injunction"). Thus, district courts may issue an injunction pending appeal when there are "difficult" legal questions presented, particularly ones that the court of appeals will review without deference, and the equities counsel in favor of a stay. *See Nat. Res. Def. Council v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 108, 121-23 (S.D.N.Y. 2012) (where there are "serious legal questions" and "difficult" issues presented that the "Second Circuit will review without deference," a stay application depends on the balance of the equities); *Cayuga Indian Nation of N.Y. v. Pataki*, 188 F. Supp. 2d 223, 253 (N.D.N.Y. 2002) ("[B]ecause of the difficulties of the issues . . . presented, it would be foolhardy to predict that there is no likelihood of success on appeal." (cleaned up)); *Cooper v. U.S. Postal Serv.*, 246 F.R.D. 415, 418-19 (D. Conn. 2007) (granting a stay where "thorny (yet interesting) First Amendment questions" warranted preserving the status quo during appeal); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844-45 (D.C. Cir. 1977)* ("[T]ribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained."). After all, the point of Rule 62(d) is not to reassess the merits, but to preserve the status quo and the ability to grant effective relief while the appeals court has time to fully consider the merits for itself. *Nken*, 556 U.S. at 427.

## A.    Plaintiffs Have a Likelihood of Success on the Merits.

Plaintiffs recognize that this Court determined that the State's gas ban is not preempted.

Dkt. 64 at 28. But Plaintiffs nevertheless have a substantial case on the merits for appeal. *Mohammed*, 309 F.3d at 100-01 (discussing formulations of the "likelihood of success" element as a "probability of success," a "substantial case on the merits," or a "substantial possibility" of success, and noting that the necessary degree of "possibility of success will vary" with the other factors (cleaned up)); *World Trade Ctr.*, 503 F.3d at 170 n.1 (same). Besides, Plaintiffs need not even show that much under the Second Circuit's flexible approach; where, as here, the balance of harms tips decidedly in Plaintiffs' favor, a serious question going to the merits is enough. *Supra* pp. 5-6; *Citigroup*, 598 F.3d at 35; *Thapa*, 460 F.3d at 334-35 (granting a stay where there was "some possibility of success and the balance of hardships tips decidedly" in the movant's favor). This case readily clears that hurdle.

1.      This Court held that the State's ban on covered gas appliances is not a "regulation concerning the . . . energy use" of covered gas appliances for the reasons articulated in the dissent from the denial of rehearing en banc in the Ninth Circuit. Dkt. 64 at 28, 30-31. To affirm, the Second Circuit would need to create a direct split with the Ninth Circuit, the only circuit to have addressed this issue. New York's ban undoubtedly would be preempted by EPCA under the Ninth Circuit's holding and reasoning in *California Restaurant Ass'n*, which focused on the challenged law's effect, not its framing:

> EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings. So Berkeley can't evade preemption by merely moving up one step in the energy chain and banning natural gas piping within those buildings. Otherwise, the ability to use covered products is meaningless if consumers can't access the natural gas available at the meter on the premises.

89 F.4th at 1107 (cleaned up). New York's gas ban undisputedly "prohibits the use of covered natural gas appliances in new buildings"—which means it does exactly what the Ninth Circuit held was preempted. *Id.*; *see also id.* at 1102 ("[A] regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source."). This Court recognized as

much by expressly rejecting the Ninth Circuit panel opinion and instead relying on the dissent (which was joined by only 8 of 28 active judges). Dkt. 64 at 30-31. This potential circuit conflict alone elevates this to a serious legal question—one that will be an issue of first impression in the Second Circuit and will be decided without deference. *See Nat. Res.*, 884 F. Supp. 2d at 121-23; *Cayuga*, 188 F. Supp. 2d at 253; *Cooper*, 246 F.R.D. at 418-419.

    **2.**    This Court's interpretation of the preemption provision, following the Ninth Circuit dissent, is inconsistent with the plain statutory text and purpose. The Court's conclusion that a gas ban does not "concern the energy use of a covered product" is based on reading "energy use" and "point of use" as "technical terms" that limit preemption to regulations that act as energy conservation standards—that is, that force manufacturers to redesign appliances in a way that changes their lab-tested energy use. Dkt. 64 at 29-31. The Court also stated that the use of the term "concerning" "does not alter the Court's conclusion" because the bans "merely prohibit the installation of any fossil-fuel equipment or system in new buildings, regardless of the energy use of such equipment or systems." *Id*. at 31.

    As Plaintiffs have explained, this interpretation, among other problems, rewrites the statute by replacing the term "energy use" with "energy conservation standard." Dkt. 37-1 at 7-13; Dkt. 54 at 2-6. If Congress had wanted to preempt only energy conservation standards, or regulations that force manufacturers to redesign appliances, it could have said so. Moreover, the Court's interpretation would have illogical consequences and allow an easy end-run around the preemption provision: Had the State set a maximum energy use for all gas appliances of 0.0001 Btu per year, it is undisputed that its regulation would be preempted. Logically, setting the maximum to zero instead is equally preempted. *Cal. Rest.*, 89 F.4th at 1102 ("[I]t is well accepted in ordinary usage that 'zero' is a 'quantity.'"). But that is what the State's ban effectively does.

That it does so through different but equally effective means does not change the result.  *See Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013) (collecting cases rejecting states' attempts to end-run preemption provisions).  The Court did not explain why achieving the same result indirectly by simply banning "*any* fossil-fuel equipment or system" is somehow outside the scope of preemption "concerning" energy use.  *Cf. Cal. Rest.*, 89 F.4th at. at 1106-07 (states and localities cannot "evade preemption" by doing indirectly what they cannot do directly).

3.      The Court's interpretation also conflicts with the statutory context.  When, as here, Congress "explicitly lists a set of exceptions" to preemption, those exceptions inform the scope of preemption.  *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 374 (2008).  The Court suggested that its interpretation could be reconciled with the building code exception because a regulation setting a "building-wide energy consumption limit" would be preempted because it is "an indirect regulation concerning the energy use of the covered products."  Dkt. 64 at 32.  But how is this so?  To be sure, a building-wide energy consumption limit is stated in terms of energy, but that says nothing about the "energy use *of the covered products*" used to meet that limit.  *Contra id.* (emphasis added).  A regulation that satisfies the building code exception could not require any change in any energy conservation standard or any redesign by a manufacturer, and so it would not be preempted under this Court's stated interpretation.  Dkt. 64 at 33 (defining "energy use" as "a static assessment of the typical quantity of energy consumed by such a product").  Allowing preemption to turn on whether a regulation uses or avoids certain words would be contrary to the long line of cases stating that a regulation cannot do indirectly what it cannot do directly.  *Am. Trucking*, 569 U.S. at 652.  That is exactly Plaintiffs' point:  An interpretation of §6297(c) that is premised on limiting preemption to product-specific regulations leaves no regulation that is preempted but for §6297(f)(3).  That is a fundamental flaw in the Court's interpretation.  *See*

*Pulsifer v. United States*, 144 S. Ct. 718, 731-32 (2024) ("[T]hat kind of superfluity, in and of itself, refutes [the court's] reading.").

As to the waiver exception, the Court appeared to state that the exception does not apply and is not relevant because the gas ban is not preempted. Dkt. 64 at 32-34. But that puts the cart before the horse. The question here is whether the gas ban is preempted to begin with, and on that point, the waiver exception sheds some light. The exception shows that Congress was concerned with consumer choice (by prohibiting waivers for regulations that would make appliances unavailable) and with the burdens of conflicting standards on manufacturers at any point in the distribution chain (by prohibiting waivers for regulations that would significantly burden manufacture, sales, distribution, or servicing). *See* 42 U.S.C. §6297(d)(3)-(4); *see also id.* §6295(o)(4) (prohibiting any amendment to energy conservation standards that would make appliance performance characteristics or features unavailable). It thus confirms that Congress was concerned not solely with the factory floor but also with the real-world impacts of state and local regulations on consumers and manufacturers.

**4.**    To the extent the Court embraced other arguments raised by the Secretary or Intervenors, *see* Dkt. 64 at 28, those arguments are no more persuasive. In particular, to the extent the Court relied on the suggestion that Plaintiffs' proposed interpretation would produce absurd results like "prohibiting a state from ever preventing the use of any covered product for any reason," Dkt. 64 at 12, 14, that is simply not the case—and Plaintiffs made no such claim, *see* Dkt. 54 at 8-11. As with similarly broad preemption provisions, Congress's intent as expressed in the statutory text provides the limiting principle. *See, e.g.*, *Cal. Div. of Labor Standards Enf't v. Dillingham*, 519 U.S. 316, 325 (1997). Nothing about applying EPCA to hold that the state's ban

is preempted endangers local health and safety regulations that have long coexisted with EPCA.[2] That is why the disaster the Secretary and Intervenors foretell here has not materialized in the Ninth Circuit since its decision a year and a half ago. As Judge Baker explained in his concurring opinion, EPCA is "unlikely" to preempt regulations that only "incidentally impact" covered products' gas consumption, such as "state and local taxes" or a decision to not extend a utility distribution system. *Cal. Rest.*, 89 F.4th at 1117. But this case does not present a close call on where the bounds of preemption lie; New York's gas ban "cuts to the heart of what Congress sought to prevent." *Id.* at 1119 (Baker, J., concurring).

*    *    *

Accordingly, and for the reasons more fully explained in Plaintiffs' summary judgment briefing, Dkts. 37-1, 54, Plaintiffs have shown a probability of success on appeal—or at the least that there are serious and difficult legal questions of first impression. That the only court of appeals to have addressed this issue has come out the opposite way signals that this Court's decision implicates a "difficult legal question" on which it would be imprudent to "predict that there is no likelihood of success on appeal"; there is a serious prospect that the Second Circuit will agree with its sister circuit. *See Cayuga*, 188 F. Supp. 2d at 253 (attribution omitted). Regardless, the Court does not have to conclude its interpretation was wrong—only that this is a difficult and novel legal question that presents a substantial case on the merits for the Second Circuit to resolve. *See Mohammed*, 309 F.3d at 100-01; *Ideal Toy*, 302 F.2d at 625; *Citigroup*, 598 F.3d at 35.

---

[2] Intervenors also suggested that the exceptions support the argument that "regulations not related to restricting or addressing energy consumption are not covered by EPCA at all." Dkt. 64 at 13. To the contrary, there is no statutory exception for regulations whose stated purpose is to improve health and safety or combat climate change. Congress could have included such exceptions to preemption if it chose, but it did not. *See Rowe*, 552 U.S. at 373-76.

**B.      Plaintiffs Will Suffer Irreparable Harm If the Ban Is Not Enjoined.**

If New York's gas ban is allowed to take effect before the Second Circuit is able to consider whether the ban is lawful, Plaintiffs will suffer direct, tangible harms that cannot be compensated by monetary damages and cannot be easily undone.  "It is well-established that the type of harm that may satisfy the 'irreparable harm' inquiry may vary widely."  *RMH Tech LLC v. PMC Indus., Inc.*, 352 F. Supp. 3d 164, 198 (D. Conn. 2018) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." (attribution omitted)).  Although monetary loss on its own is ordinarily not irreparable, economic injuries caused by a state are irreparable when sovereign immunity prevents federal courts from awarding damages for them, as is the case here.  *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013); *accord United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (affirming the district court's finding that the plaintiff's "injury was irreparable even though [its] losses were only pecuniary because a suit in federal court . . . to recover the damages . . . would be barred by the Eleventh Amendment"); *see also Donohue v. Paterson*, 715 F. Supp. 2d 306, 316 (N.D.N.Y. 2010) ("[W]here a federal remedy to recover pecuniary losses is barred under the Eleventh Amendment, irreparable harm is present." (attribution omitted)).

In any event, Plaintiffs face the sorts of economic harms that are irreparable even without sovereign immunity.  It is well established that some economic harms' magnitude or character makes them irreparable, such as when "a party is threatened with the loss of a business" or lost business opportunities.  *Tom Doherty Assocs. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("[T]he right to continue a business is not measurable entirely in monetary terms." (cleaned up)); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (lost business opportunities can be "difficult to establish and measure" and can thus amount to irreparable harm); *Entergy Nuclear*, 733 F.3d at 423 (holding that forcing a business to shut down would cause

irreparable harm).  A "threat[]" to "the very viability of [Plaintiffs'] business[es]" amounts to irreparable harm.  *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 668 (2d Cir. 2023) (cleaned up).  That is because "the right to continue a business is not measurable entirely in monetary terms, especially when that business is essential to the [party's] manner of living."  *Id.* (cleaned up); *see also fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 149 (S.D.N.Y. 2024) ("The caselaw in this Circuit is clear that money is not a remedy for the total collapse or likely insolvency of a business.").

The loss of longstanding customer relationships and goodwill, as well as relationships with suppliers and subcontractors, also constitutes irreparable harm—as does having to shift into new lines of business in which a party lacks established reputation and market share.  *See JTH Tax*, 62 F.4th at 673 ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." (attribution omitted)); *Register.com*, 356 F.3d at 404 (loss of reputation, goodwill, and business opportunities); *Tom Doherty*, 60 F.3d at 38 (loss of goodwill); *Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 261 (N.D.N.Y. 2015) (noting that "[t]he Second Circuit also recognizes that the loss of potential business opportunities, such as relationships with customers and business partners, may constitute irreparable harm").  Likewise, the loss of a party's employees can constitute irreparable harm because it "deprives [the party] not only of its investment in training and developing those employees, but also . . . the relationships developed with them at [the party's] expense."  *Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 31, 2008).

Here, Plaintiffs and their members fit comfortably within these categories and types of irreparable harm.  They have already suffered substantial economic losses in sales, revenues, and lost work, and these damages will immediately escalate on January 1, 2026—with many plaintiffs

and their members estimating lost revenues, projects, or work ranging from 20% to well over 50% in 2026. Plaintiffs and their members also are threatened with having to close their businesses or lines of business, loss of work opportunities, loss of customer relationships and goodwill, employee layoffs, and business restructuring including relationships with suppliers and subcontractors.

Start with the propane gas industry. As the National Propane Gas Association ("NPGA") explains, most of its 100 New York members "are small, family-owned businesses that employ fewer than 50 people." *See* Ex. 1 (Decl. of S. Kaminski) ¶ 5. Those businesses sell propane systems, equipment, and gas and will see their market in new construction disappear on January 1, 2026, imposing serious injuries that cannot be later undone. *Id.* ¶¶ 4, 6, 18. Not only will NPGA's members suffer an immediate and substantial drop in sales and revenues for new construction in the millions of dollars, but also existing homeowners are declining using propane as an energy source in light of concerns with the ban's impact on future availability of equipment, service, and supply. *Id.* ¶¶ 6-17. Most members plan to lay off employees in 2026 and may have to make other structural changes to avoid closing; as one member wrote, "Unless changes are made, we foresee being forced to close our doors entirely—ending a vital local service and eliminating dozens of good-paying jobs in the process." *Id.* ¶¶ 8-17.

As Mulhern Gas Co., a member of NPGA and the New York Propane Gas Association, explains, it "has delivered, installed, and serviced propane equipment and propane gas for local customers for more than fifty years. The impending gas ban is an existential crisis for the company—New York has outlawed much of our new business development and impacted our existing business." Ex. 2 (Decl. of R. Cummings) ¶¶ 3, 7. Roughly 20% of the company's sales are in new homes, and when the ban goes into effect on January 1, 2026, there will be "an

immediate drop in sales of roughly 10%" with "a continuing decline in sales and service thereafter." *Id.* ¶ 10.  Mulhern Gas will have to lay off employees, "downsize or sell" assets, and "change our business plans and operations going forward;" these injuries cannot be easily undone. *Id.* ¶¶ 11-13.

Similar to Mulhern Gas, Holmes Mechanical, Inc. is a family-owned HVAC and gas systems business in upstate New York that has seen its sales decline and expects to lose an additional 25% of its overall sales revenue when the ban goes into effect in 2026.  Ex. 3 (Decl. of J. Holmes) ¶¶ 3-5, 9.  Trying to switch to sales of electric heat pump systems to save the business has come with costs and burdens and has left customers dissatisfied.  *Id.* ¶¶ 7-11.  "Our business is being disrupted and slowing to a crawl while we try to reorganize operations, sales, and employees." *Id.* ¶ 10.

Likewise, New York home builders will be adversely affected in 2026 when the ban goes into effect.  The New York State Builders Association represents the residential building construction industry and has approximately 1800 members employing tens of thousands of New York residents.  Ex. 4 (Decl. of M. Fazio) ¶ 3.  As several of those members attest, they had "committed to costly working drawings and specifications that incorporate gas infrastructure" and contracted with gas utilities for multi-unit residential developments before the ban was adopted; once the ban goes into effect, it "will prevent [them] from delivering the promised customers to the utility, which will require [them] to pay the cost of the infrastructure that the utility would otherwise bear."   Ex. 5 (Decl. of P. Nanula) ¶¶ 5-6; *see also* Ex. 6 (Decl. of L. Michaels) ¶ 5; Ex. 7 (Decl. of J. Graziose) ¶¶ 5-9; Ex. 8 (Decl. of Bob DeForrest) ¶ 3; Ex. 4 ¶¶ 5-6.  The gas ban also will raise the cost of housing because all-electric construction is more expensive, resulting in slower sales and a lack of customer choice.  Ex. 5 ¶¶ 7-9; Ex. 6 ¶¶ 7-9; Ex. 8 ¶¶ 4-5.  The lack of

adequate electrical grid infrastructure in some areas will also delay building developments and raise costs further. Ex. 6 ¶ 8; Ex. 7 ¶¶ 5-7, 9-10; Ex. 4 ¶¶ 5-8. As a result, builders anticipate building and selling fewer homes in 2026 once the ban goes into effect, harming their businesses and requiring them to change business plans and operations. Ex. 6 ¶¶ 7-8 ("We estimate that our sales numbers will drop by at least 50% with the all-electric mandate, with a substantial drop happening the first year in 2026."); Ex. 5 ¶¶ 7-9; Ex. 7 ¶ 10; Ex. 8 ¶¶ 4-5.

The impacts are even more catastrophic for the members of Northeast Hearth, Patio & Barbecue Association, many of which earn the majority of their revenue from gas fireplace installation in new construction—a line of business that will vanish on January 1, 2026. *See* Ex. 9 (Decl. of K. Arpino) ¶¶ 5-6 ("A vast majority of gas fireplaces are in new construction."); *see also* Ex. 10 (Decl. of L. Stritsman) ¶ 3 ("Most gas fireplaces sold today are installed in new construction homes—roughly 90%. That makes new buildings critical for the gas fireplace market and business."). Those members are often small, family-owned businesses that are threatened with the devaluation or loss of their entire business, will be forced to lay off half or more of their employees, and will otherwise have to restructure their businesses to try to survive. *See, e.g.*, Ex. 10 ¶¶ 5-6.

Best Fire Hearth & Patio, for example, a 48-year-old family business, states that once the ban goes into effect, it will suffer "a more than 50% loss of revenue." Ex. 10 ¶¶ 2, 4. To continue operating viably, it would need to lay off one-third of its highly skilled and trained employees and take other steps to save the business, such as selling service vans and trucks, changing office and warehouse locations, and trying out new lines of business. *Id.* ¶¶ 5-11.

Season Fireplaces similarly attests that 50% of its business is in new construction and that "if the gas ban goes into effect, we stand to lose [half our] sales." *See* Ex. 11 (Decl. of T. Giannovola) ¶¶ 2-4. "[I]t will be a major struggle to keep the business going . . . . I possibly would

have to sell the building I run my business in . . . .  And I would probably have to cut my staff in half."  *Id.* ¶¶ 5-6.  "A court decision sometime in 2026 will come too late to help.  I may have already had to shutter my business by then."  *Id.* ¶¶ 9, 11.

Ocean Stone & Fireplace reports that "new developments represent about 85% of our overall income;" gas fireplaces alone represent 35% of its business, and the loss of gas fireplaces also impacts related stone and masonry work.  Ex. 12 (Decl. of D. Karatas) ¶¶ 3-6.  Once the ban goes into effect, it will have to lay off employees, end relationships with suppliers, and dump unsellable inventory, and the business will lose two-thirds of its existing value.  *Id.* ¶¶ 7-11.

The ban is also harming Northeast Hearth itself.  The organization has already seen a 15% decline in membership and dues as its New York members go out of business, merge, or sell in the face of the impending ban; of 100 New York members, 25 are already gone.  *See* Ex. 9 ¶ 7.

Plumbers, pipefitters, and gas utility workers will also suffer harm in 2026 if the ban is not enjoined pending appeal.  As the Plumbing Contractors Association of Long Island explains, "Gas plumbing projects represent about 30% of our members' business . . . .  Our members currently anticipate a loss of 15% to 20% of their business in 2026 when the law becomes effective."  Ex. 13 (Decl. of R. Schaffer) ¶ 6.  The lost work opportunities will cost some members their business or force them to restructure their businesses and either retrain or lay off employees.  *Id.* ¶¶ 9-11.  Similarly, the Master Plumbers Council reports that for its members, roughly 30% of their business is in gas-related plumbing work, and that its members are all having contracts canceled or downsized and will have to lay off employees.  Ex. 14 (Decl. of A. Caiazzo) ¶¶ 5-10.

The International Brotherhood of Electric Workers Local Union 97 has roughly 600 members dedicated to gas utility work; when the ban goes into effect, pipe extensions and service line connections will drop, and the resulting loss of work "will decrease work hours and

opportunities for our members, and either cost some members their jobs . . . or force them to re-train for other lines of work or to relocate their families." Ex. 15 (Decl. of M. Shelby) ¶¶ 4-10. Likewise, the International Brotherhood of Electric Workers Local 1049 has roughly 560 members dedicated to gas transmission, distribution (main and service line extensions and meters), and inspection work for whom "25% to 50% of their work is tied to new construction." Ex. 16 (Decl. of P. Guidice) ¶¶ 4-5. "When the gas ban goes into effect in 2026, that new-construction work will be largely eliminated, threatening the work hours and opportunities, if not the jobs, of our members." *Id.* ¶ 5. Plumbers Local Union No. 200, U.A., AFL-CIO, attests that when the ban goes into effect, it "will result in the loss of member jobs, lower hours worked by members, and the commensurate loss of hours to Local 200's associated fringe benefit funds." Ex. 17 (Decl. of R. Brooks) ¶¶ 4-5.

In short, Plaintiffs are facing irreparable harms during the pendency of their appeal to the Second Circuit. Even months to a year of the gas ban being in effect will have devastating consequences that cannot be meaningfully remedied monetarily, even were money damages available against the Secretary. Many small businesses are threatened with closing their doors, and many workers with losing their jobs. Sales lost will not be regained, nor will company goodwill and relationships with customers, suppliers, or subcontractors. Plaintiffs and their members will have to restructure business operations, sell assets, and lay off employees, and they will lose work opportunities, have training programs depleted, and potentially have to change jobs or relocate. The Court should exercise its equitable authority to prevent these harms while the Second Circuit hears this case.

### C. The Balance of Harms Tips Decidedly in Plaintiffs' Favor Because There Is No Significant Harm to the Secretary from a Short Delay in Effective Date.

As just detailed, Plaintiffs will suffer devastating harms if the gas ban is not enjoined

pending appeal, including substantial economic harm that cannot be recouped given New York's sovereign immunity.  Starting January 1, 2026, Plaintiffs will lose sales and in many cases the majority of their revenues; will have to close businesses or lines of business; will lose customers, goodwill, and longstanding business relationships; will suffer from layoffs, loss of work hours or job opportunities; and will have to reorganize business operations.  These harms will occur in the next year and cannot simply be unwound if Plaintiffs prevail on appeal. *See supra* pp. 14-18.

On the other hand, the Secretary will suffer no significant harm from a short delay in the effective date of New York's gas ban. The statutory provisions were adopted by the legislature on May 2, 2023 and signed into law by the Governor, 2023 N.Y. Laws c. 56, pt. RR, § 6; N.Y. Energy § 11-104(6)-(8); N.Y. Exec. § 378(19).  Those statutes built in an almost two-year delay until the ban's effective date, implicitly recognizing that there is no need for immediate action and that there are countervailing considerations at play.  The state did not proceed like its ban was an emergency measure.  That intentional delay in implementation signals that the exact timing of when the ban goes into effect was not of critical import.  Accordingly, a short extension of the ban's effective date would not appear to impose a significant harm on the Secretary.

Indeed, the Secretary argued repeatedly that the statutory deadline was not in fact a deadline and that the Council might not even act by the end of 2025—or at all—to adopt the gas ban.  Dkt. 38-1 at 15 ("But the timing for completion of those [Council] processes and the outcome of the Council's vote both remain uncertain."); *id.* at 14 ("The content, and very existence, of any such prohibitions, and how they may or may not come to impact Plaintiffs in a concrete way, will not materialize unless and until the Codes are finally amended and become legally effective, no

sooner than after the end of 2025.").[3]  The Secretary was wrong, but given that the Secretary's position over the last year and a half has been that there is no actual deadline for the ban to go into effect, the Secretary should not now be allowed to claim that a short extension of that same effective date will cause drastic harm.  The Secretary simply has not until now been proceeding as if this deadline were of paramount importance.

Nor would an injunction pending appeal impose any burden or expense on the Secretary.  Neither would it constrain the behavior of any individual or business; consumers, builders, and businesses alike are free to choose all-electric construction over the use of fossil fuels.[4]  The existing building and energy codes would simply remain in effect.  Also, the impact of a delay of months on the State's decades-long energy and climate goals would be limited, particularly given that any immediate impact from replacing mixed-fuel construction with all-electric construction will be muted because most of the State's electricity comes from fossil fuels.[5]  In sum, there is no substantial harm to the Secretary from a short extension of the ban's effective date.

---

[3] *See also* Dkt. 53 at 5 ("[N]o effective date will adhere until the Code Amendments are finally adopted. . . . The Council is already at work on the Code Amendments but the schedule for adoption is subject to the constraints of a governmental body that meets quarterly with a large docket, as well as the possibility of the need to amend and repropose the regulations based on comments received during the administrative process.").

[4] In fact, the Secretary suggested when challenging Plaintiffs' standing that "declining sales of propane and propane equipment are not related to New York's statutory" gas ban but instead are caused by other factors such as consumer choice.  Dkt. 64 at 25 (citing Dkt. 48-1 at 14-15).  The Secretary can hardly claim now that holding the gas ban in abeyance will cause any substantial harm to New York's long-term goals.

[5] *See New York: State Profile and Energy Estimators*, U.S. Energy Info. Admin. (last updated Jan. 16, 2025), https://www.eia.gov/state/analysis.php?sid=NY ("In 2023, natural gas-fired power plants accounted for almost three-fifths of New York's generating capacity and provided 46% of the state's electricity net generation, generating twice as much electricity as any other fuel source.  Natural gas fuels 6 of the state's 10 largest power plants by capacity and 5 of the 10 largest by annual generation." (footnotes omitted)).

Given the devastating harm to Plaintiffs and their members and the limited harm to the Secretary from a slightly extended delay in the ban's effective date,[6] the balance of harms weighs decidedly in Plaintiffs' favor.  *See Citigroup*, 598 F.3d at 35.

### D. The public interest favors preserving the status quo to allow the Second Circuit time to address the issue.

Where, as here, "the Government is the opposing party," the third and fourth factors—the balance of equities and the public interest—merge.  *Nken*, 556 U.S. at 435.  As discussed, the balance of harms weighs sharply in Plaintiffs' favor—which should dispose of this issue.  *See supra* pp. 18-21.  Moreover, because there is "no cognizable state interest in enforcing … laws that are preempted by federal law," *Champion Int'l Corp. v. Brown*, 731 F.2d 1406, 1409 (9th Cir. 1984), the public interest lies in staying enforcement of a potentially preempted law in order to allow the Second Circuit time to decide the issue.  *See, e.g.*, *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest.").

What's more, EPCA embodies Congress's decision that there should be a uniform national energy policy, and in particular one that encourages a diverse domestic supply of energy and protects manufacturing and consumer choice—all of which New York's gas ban undermines.  *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046 at 1059-60 (9th Cir. 2009) (while the court did not "denigrate the public interest represented by the Ports, that must be balanced against the public interest represented in Congress' decision to deregulate the motor carrier industry, and the Constitution's declaration that federal law is to be supreme").  Interim relief would not prevent

---

[6] Plaintiffs plan to move to expedite in the Second Circuit.  The Secretary indicated that he would agree to expedite the appeal only if Plaintiffs agreed to forgo an injunction pending appeal. Nevertheless, even if an injunction pending appeal is granted, Plaintiffs will commit to moving to expedite in order to mitigate any consequences of delay.  Plaintiffs have already requested and received an accelerated October 3, 2025 deadline for their opening brief.

anyone from using electric systems or appliances; it would merely protect Plaintiffs' rights to conduct their businesses and professions without being subject to the burdens and constraints of a preempted law while their appeal is pending. Thus, the public interest is served in this case by an injunction to maintain the status quo, keeping the prior building and energy codes in place while the validity of the State's gas ban is determined.

## II. An Injunction Pending Appeal Is Also Warranted to Preserve the Federal Courts' Jurisdiction Given the Secretary's Apparent Position That This Case Will Become Moot When the Ban Takes Effect.

The All Writs Act operates as "a residual source of authority to issue writs that are not otherwise covered by statute" and acts to "fill[] the interstices of federal judicial power when those gaps threaten[] to thwart the otherwise proper exercise of federal courts' jurisdiction." *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 41-43 (1985). The All Writs Act, which dates back to the first Judiciary Act of 1789, provides in pertinent part: "[A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. §1651(a).

Thus, "where a case is within the appellate jurisdiction of the higher court[,] a writ may issue in aid of the appellate jurisdiction which might otherwise be defeated." *FTC v. Dean Foods Co.*, 384 U.S. 597, 603, 608 (1966) (court of appeals could "protect its own jurisdiction" by enjoining a merger pending appeal given the FTC's allegation that it would be difficult to fashion an effective remedy were the merger completed); *see also Michael v. INS*, 48 F.3d 657, 663-65 (2d Cir. 1995) (holding that the All Writs Act allowed the court to "safeguard [its] appellate jurisdiction" by issuing a stay of deportation where a detainee's departure would moot the case).

Here, the Secretary's prior positions and briefing suggested that, in the Secretary's view,

the gas ban taking effect will moot this case.  Although Plaintiffs disagree with that view, [7] the prospect of a jurisdictional controversy if the ban is allowed to take effect pending appeal counsels in favor of this Court exercising its authority under the All Writs Act to preserve the status quo as a means to aid jurisdiction over Plaintiffs' claim.

The Secretary has persistently maintained that the challenged state statutes are of no force and effect and that only the Council's code provisions can be challenged.  *See* Dkt. 38-1 at 14 (arguing that "the statutes that Plaintiffs attack impose no legal restrictions upon them" and that "the form of final enforceable regulations . . . await final agency action").  That was the gist of the Secretary's ripeness and standing arguments—that all the action is in the code provisions, not the statute.  *See* Dkt. 33 at 10 (proposing as part of the case management plan that in "lieu of" the Secretary moving to dismiss, the case should be delayed indefinitely and that Plaintiffs should forgo their challenge to the statute and wait to amend their complaint to challenge the code provisions when adopted).  Similarly, the Secretary has suggested that, once the amendments take effect, enforcement will primarily be the responsibility of local, not state, regulators.  *See* Dkt. 25 at 4.  It thus appears that the Secretary's position is that once the code provisions take effect, Plaintiffs' challenge to the statute will become moot because the Secretary will have nothing left to do under the statute—in other words, the claim will not be ripe until it is moot.

This is the very type of situation in which an order is appropriate under the All Writs Act to protect the federal courts' jurisdiction to complete their resolution of this dispute and to be able to afford relief if Plaintiffs prevail on appeal.  *See, e.g.*, *Oneida Indian Nation of N.Y. v. Madison*

---

[7] The Court also appeared to disagree with that view, stating, in denying the Secretary's motion for judgment on the pleadings, that "the Secretary's enforcement of the Codes is an extension of the injury that flows from the statutes," such that, "to the extent Plaintiffs' alleged injuries are based on the threat of future enforcement, they are sufficiently traceable to Defendant."  Dkt. 64 at 26.

*County*, 376 F. Supp. 2d 280, 283 (N.D.N.Y. 2005) (invoking 28 U.S.C. §1651(a) to enjoin a county foreclosure proceeding because allowing the foreclosure would moot the issue of its permissibility and deprive the court "of its jurisdiction to decide the complex and significant issues presented in this case").  This Court has already expended significant judicial resources to adjudicate Plaintiffs' strictly legal claim, which raises issues of public importance.  To avoid unnecessary uncertainty over whether the Second Circuit will be able to complete its review given the Secretary's likely position on mootness, it is in the interests of justice and well within the Court's discretionary power to preserve the status quo pending appeal.

## CONCLUSION

The Court should enjoin the Secretary from approving or enforcing the gas ban or the implementing code provisions pending resolution of Plaintiffs' appeal in the Second Circuit.

Dated: September 10, 2025                        Respectfully submitted,

                                                 */s/ Sarah O. Jorgensen*

Caroline M. Walters (NDNY Bar No. 705759)        Sarah O. Jorgensen (NDNY Bar No. 704794)
REICHMAN JORGENSEN                               REICHMAN JORGENSEN
    LEHMAN & FELDBERG LLP                            LEHMAN & FELDBERG LLP
400 Madison Avenue, Suite 14D                    1201 West Peachtree Street, Suite 2300
New York, NY 10017                               Atlanta, GA 30309
Telephone: (212) 381-1965                        Telephone: (404) 609-1040
cwalters@reichmanjorgensen.com                   sjorgensen@reichmanjorgensen.com

Brian C. Baran (*Pro Hac Vice*)                  Courtland L. Reichman (*Pro Hac Vice*)
REICHMAN JORGENSEN                               REICHMAN JORGENSEN
    LEHMAN & FELDBERG LLP                            LEHMAN & FELDBERG LLP
1909 K Street, NW, Suite 800                     100 Marine Parkway, Suite 300
Washington, DC 20006                             Redwood Shores, CA 94065
Telephone: (202) 894-7310                        Telephone: (650) 623-1401
bbaran@reichmanjorgensen.com                     creichman@reichmanjorgensen.com

                                                 *Attorneys for Plaintiffs*